818 So.2d 432 (2002)
Raymond MORRISON, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. SC94666.
Supreme Court of Florida.
March 21, 2002.
Rehearing Denied May 29, 2002.
*437 Nancy A. Daniels, Public Defender, and Chet Kaufman, Assistant Public Defender, Second Judicial Circuit, Tallahassee, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Curtis M. French, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Raymond Morrison, Jr. We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution. For the reasons expressed below, we affirm the judgment and sentence.
Raymond Morrison, Jr. was charged with first-degree murder for the January 8, 1997, killing of Albert Dwelle, which occurred during the course of a robbery upon Dwelle in his apartment in Duval County. Morrison was also charged with armed robbery with a deadly weapon and burglary of a dwelling with intent to commit a battery, with an assault or battery on Dwelle.
The evidence presented at trial revealed the following facts. On January 9, 1997, the dead body of eighty-two-year-old Dwelle was found on the floor of his bedroom by service personnel from Meals on Wheels. An autopsy revealed numerous injuries on the body of Dwelle, including contusions and abrasions to the head, chest, arms, and hand. According to the medical examiner, Dwelle died from loss of blood due to two lethal knife wounds to the throat. One was a stab wound to the left side of the neck which penetrated to the depth of almost five inches, perforating the esophagus and nicking the cervical vertebrae. A second wound to the neck was described as an incised wound across the front of the throat. As a consequence, *438 Dwelle aspirated the blood caused by the knife wounds to his neck.
Dwelle was disabled for many years, having suffered a stroke during a bout of typhoid fever at age six or seven. He could not use his left hand or arm, he could hardly stand up and walk, and he needed assistance to bathe, dress, and cook. Meals on Wheels delivered his meals once a day.
Investigation by police revealed that Morrison had visited his girlfriend, Sandra Brown, on January 8, 1997. Brown lived at the Ramona Apartments in an upstairs apartment directly across from Dwelle's apartment. Morrison spent the afternoon of January 8, 1997, socializing with Brown and her uncle at Brown's apartment. At some point in the late afternoon or early evening, Brown and Morrison walked to the local convenience store to buy some beer. Brown paid for the beer with money she had just received for babysitting. To her knowledge, Morrison did not have any money. They returned to Brown's apartment where they drank the beer with Brown's uncle. Brown's uncle later left to return to his own home. At about 9 p.m., Morrison prepared two steaks and placed them in the oven to cook. He then told Brown that he was going to take the trash out. He did not return to Brown's apartment and was not seen again by Brown until the next day at a different location. On that occasion, Morrison apparently avoided contact with Brown, who was attempting to talk to him to find out why he had left so abruptly the previous night.
Morrison was arrested on January 10, 1997, by Officer Anthony Richardson, on a warrant for failure to pay child support. Immediately upon arrest, Morrison asked Richardson if "this [his arrest] was about that old man." Richardson told him that he was being arrested for failure to pay child support but that some homicide detectives also wanted to talk to him, so Richardson was taking him to the homicide office of the Jacksonville Sheriff's Office. Richardson then advised Morrison of his constitutional rights. Morrison learned that Richardson, in addition to being a police officer, was also a pastor in a local church. On the way to the police station, Morrison and Richardson discussed religion and Morrison's need to get his life in order. Richardson then turned Morrison over to homicide detectives Terry Short and T.C. Davis.
During a lengthy interview about the Dwelle murder, Morrison told Short that he wanted to talk to Richardson again. Short paged Richardson and Richardson returned to the police station to talk with Morrison. On the morning of January 11, 1997, and following a discussion with Richardson, Morrison gave a written statement detailing his involvement in the death of Albert Dwelle. The text of Morrison's written statement seen by jurors is as follows:
On Wednesday 01-08-97 at approximately 9:00 PM I had been smoking crack with Big Man. I ran out of crack and had no money. I went to Apt. 68 and sat on the steps. I was drinking a beer. I wanted a cigar. I knocked on the door of Apt. # 64. The man came to the door and I ask him for a cigar. He started telling me he couldn't let me come in. I ask for a light for the cigar he gave me. He went back into his bed room to get me a light. I follow him to the bed room. He reached into his shirt pocket hanging on a chair by the bed and handed me a light. I put the lighter back on the chair. I saw money in the shirt pocket. I reached over and grabbed a few bills out of his shirt pocket. He saw me take the money. He got a knife from somewhere and began swinging it at me. I tried to grab him *439 to defend myself and also not to hurt him. I grabbed him by the arm and turned him around so he was facing away from me. He was thrusting the knife back over his shoulders at me. I was holding his right arm and he was still thrashing the knife trying to cut me. While he was trying to cut me the knife accidentally cut across his throat. I didn't know at the time that it had cut him. I was still holding him and he got even wilder thrusting the knife and I guess he got cut again. That's when I saw he was cut.
I laid him down on the floor and picked up the knife. I left the apartment and went to another part of the complex where I hid the knife under a brick.
I then went to Big Mans house and got him to take me to the Chevron. We got gas and he took me to Marietta. When we got to Marietta I bought some drugs with the money I took from the old man. I then went back to Ramona Park where Big Man dropped me off and he went home. I saw my uncle Cap and I got in the car with him. I stayed with Cap until Friday morning and continued smoking dope and drinking till then. Police picked me up Friday after noon.
Morrison also said he took the victim's money and spent it on drugs and prostitutes. In addition, Morrison was seen shortly after the murder attempting to sell silver coins, similar in size and appearance to coins owned by Dwelle and missing from Dwelle's apartment after the murder. Finally, Morrison led the detectives to the knife that he said he used to kill the victim.
On September 25, 1998, the jury found Morrison guilty as charged. After penalty proceedings, the same jury returned a recommendation of death by the vote of twelve-to-zero. The court sentenced Morrison to death for the first-degree murder, and on the other charges found Morrison to be a habitual violent felony offender and sentenced him on each count to life imprisonment, including a minimum mandatory term of fifteen years, to be served consecutively. The court found five aggravating circumstances but said it weighed four: (1) Morrison had prior violent felonies for a 1988 conviction of attempted robbery and a 1991 conviction of aggravated battery, given "great weight"; (2) the murder was committed during a robbery and burglary with assault, given "great weight"; (3) the murder was committed for pecuniary gain, which had no weight because it merged with the murder committed during a robbery aggravator; (4) the murder was heinous, atrocious, or cruel, given "great weight"; and (5) the victim was particularly vulnerable due to advanced age and disability, given "great weight".
Although the court found no statutory mitigating circumstances, it did find and weigh eight nonstatutory mitigators: (1) good jail conduct in that Morrison presented no danger to the police when arrested, cooperated with the police during his detention, and led police to the murder weapon, given "some weight"; (2) there would be no parole or other release from prison from a life sentence for first-degree murder, given "some weight"; (3) Morrison cooperated with the police, given "some weight"; (4) Morrison abused alcohol and cocaine and most likely used the robbery proceeds to purchase more alcohol and cocaine, accorded "some weight"; (5) Morrison was employed, accorded "some weight"; (6) Morrison has only borderline intellectual ability, and when combined with alcohol and drug abuse, it results in bad judgment, accorded "great weight"; (7) Morrison has a positive family background and character, and assumed some *440 responsibility for management of the home at an early age, accorded "some weight"; and (8) Morrison adjusted well to incarceration, albeit with a record of an escape conviction, given "some weight." Morrison timely filed this appeal.[1]

I. GUILT PHASE

Request for New Counsel
First, Morrison claims the trial court erred in failing to adequately address Morrison's request for new counsel prior to trial. In Hardwick v. State, 521 So.2d 1071 (Fla.1988), this Court adopted the procedure announced in Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973), to be followed when a defendant complains that his appointed counsel is incompetent. When this occurs, the trial judge is required to make a sufficient inquiry of the defendant to determine whether or not appointed counsel is rendering effective assistance to the defendant. See Howell v. State, 707 So.2d 674, 680 (Fla.1998). However, as a practical matter, the trial judge's inquiry can only be as specific as the defendant's complaint. See Lowe v. State, 650 So.2d 969 (Fla.1994). This Court has consistently found a Nelson hearing unwarranted where a defendant presents general complaints about defense counsel's trial strategy and no formal allegations of incompetence have been made. See Davis v. State, 703 So.2d 1055, 1058-59 (Fla. 1997); Gudinas v. State, 693 So.2d 953, 962 n. 12 (Fla.1997); Branch v. State, 685 So.2d 1250, 1252 (Fla.1996). Similarly, a trial court does not err in failing to conduct a Nelson inquiry where the defendant merely expresses dissatisfaction with his attorney. See Davis, 703 So.2d at 1058-59; Branch, 685 So.2d at 1252; Dunn v. State, 730 So.2d 309, 311-12 (Fla. 4th DCA 1999).
In Dunn, the Fourth District determined that no Nelson hearing was required where the defendant expressed dissatisfaction with his counsel's trial preparation, his witness development, and his lack of contact with the defendant. See Dunn, 730 So.2d at 312. According to the district court, the defendant was not clearly alleging that defense counsel was incompetent. See id. A lack of communication is not a ground for an incompetency *441 claim. See Watts v. State, 593 So.2d 198, 203 (Fla.1992); Parker v. State, 570 So.2d 1053 (Fla. 1st DCA 1990). Moreover, in Branch, this Court found Nelson inapplicable where a defendant questioned defense counsel's preparation for trial, as well as the amount of communication he had with the defendant. See Branch, 685 So.2d at 1250; see also Gudinas, 693 So.2d at 962 n. 12 (stating that a Nelson inquiry was not required because the defendant's claim was a general complaint about defense's trial strategy and not a formal allegation of incompetence).
Most recently, in Sexton v. State, 775 So.2d 923 (Fla.2000), this Court addressed a similar issue where the defendant claimed that the trial court erred in failing to adequately address the defendant's request for new counsel, and said:
In the present case, it does not appear that [the defendant] made a formal allegation of incompetence entitling him to a Nelson hearing.... Because [the defendant] was merely noting his disagreement with his attorney's trial strategy and preparation and was not asserting a sufficient basis to support a contention that his attorney was incompetent, we find this point on appeal to be without merit.
Accordingly, in the instant case, Morrison did not make a formal allegation of incompetence entitling him to a Nelson hearing. Although Morrison did make several requests to replace his counsel, the claims contained in the letters submitted to the trial court centered principally around Morrison's dissatisfaction with the amount of communication between him and counsel. A lack of communication, however, is not a ground for an incompetency claim. See Watts, 593 So.2d at 203; Parker, 570 So.2d at 1053. Morrison also expressed displeasure with counsel's refusal to provide copies of legal documents and efforts in contacting witnesses. These complaints can best be described as general complaints about his attorney's trial preparation, witness development, and trial strategy. See Dunn, 730 So.2d at 312. As this Court repeatedly has stated, a trial court does not err in failing to conduct a Nelson inquiry where the defendant makes such general complaints and is not clearly alleging incompetence. See Davis, 703 So.2d at 1058-59; Gudinas, 693 So.2d at 962 n. 12; see also Dunn, 730 So.2d at 311-12.
Moreover, as stated in Lowe, a trial judge's inquiry into a defendant's complaints about his or her attorneys "can only be as specific and meaningful as the defendant's complaint." 650 So.2d at 975. While the trial court did not conduct a full Nelson inquiry in the present case, the court did inquire of defense counsel concerning the pro se motions to suppress (which included Morrison's complaints regarding counsel), at a hearing on June 26, 1998. Not only did Morrison not persist in his complaints about counsel when given the opportunity to do so at the June 26 hearing, but, following that hearing, which occurred almost three months before trial, Morrison made no further motions or complaints until after the trial was over. See Davis, 703 So.2d at 1059 ("Davis's silence after hearing what his attorney had been doing to ready the case for trial would lead one to believe that Davis felt his concerns had been heard by the judge and his lawyer and he was content to proceed."). The one question Morrison did still have concerned his uncle Fred Austin not testifying, but this too was explained to Morrison. Given the opportunity to raise anything further, Morrison was silent. The court had every reason to assume that Morrison's concerns had been addressed and alleviated by the inquiry *442 that occurred and the explanations given to him.
As the record indicates, the court made sufficient inquiry to determine whether there was reasonable cause to believe that counsel was not rendering effective assistance. Because Morrison was merely noting his disagreement with his attorney's frequency of communication, trial strategy, and trial preparationand was not asserting a sufficient basis to support a contention that his attorneys were incompetent we find Morrison's claim is without merit.

Voir Dire
Next, Morrison claims the trial court erred in excusing venireperson Staples for cause because Staples was unsure if he would be able to vote for a death sentence if selected a juror. The United States Supreme Court has articulated the standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment:
[W]hether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ... [T]his standard likewise does not require that a juror's bias be proved with "unmistakable clarity."
Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (footnote omitted) (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). "The trial judge has the duty to decide if a challenge for cause is proper, and this Court must give deference to the judge's determination of a prospective juror's qualifications." Castro v. State, 644 So.2d 987, 989 (Fla.1994) (citing Witt, 469 U.S. at 426, 105 S.Ct. 844). "It is within a trial court's province to determine whether a challenge for cause is proper, and the trial court's determination of juror competency will not be overturned absent manifest error." Fernandez v. State, 730 So.2d 277, 281 (Fla.1999) (citing Mendoza v. State, 700 So.2d 670, 675 (Fla.1997)). "A trial court has latitude in ruling upon a challenge for cause because the court has a better vantage point from which to evaluate prospective jurors' answers than does this Court in our review of the cold record." Mendoza, 700 So.2d at 675.
There is no "requirement that a juror may be excluded only if he would never vote for the death penalty." Witt, 469 U.S. at 421, 105 S.Ct. 844. Nor must a court find a juror qualified if he "might vote death under certain personal standards." Id. at 422, 105 S.Ct. 844. In this case, it is true that juror Staples expressed a belief in the death penalty for a person who "was in my home, [and] killed my children," and he might even be able to personally "kill" such a person "[i]f it was happening to me, in my home." It is clear, however, that while he might support a death sentence under this personal standard in these very limited circumstances, he was not sure that he could follow the law or ever vote for a death sentence as a juror.
Upon first being questioned about the death penalty, Staples said he would "prefer to see a person rehabilitated, even if they have murdered somebody," and said he did not "know if [he] could push for the death penalty." Later, when asked if he could recommend a death sentence if he were to find that the aggravating factors outweighed the mitigating factors, Staples answered that he was "not sure." After the trial court explained the law and stated that the question was whether Staples could follow that law, Staples answered that he "still [was] not sure."[2]
*443 This equivocation, i.e., "not sure," is sufficient to support his excusal for cause, particularly in the absence of any attempted defense rebuttal. See Fernandez v. State, 730 So.2d 277, 281 (Fla.1999) (holding no manifest error shown in excusing four prospective jurors who "gave equivocal responses to questions from the prosecutor, defense counsel, and the court as to whether they could follow the law and set aside their beliefs concerning the death penalty"); see also Sims v. State, 681 So.2d 1112, 1117 (Fla.1996) (holding that trial court did not abuse discretion in excusing venireperson for cause because venireperson's response to whether she would be able to vote for the death of defendant was "I am not sure" and, thus, she demonstrated that she was "clearly uncomfortable with the question of whether she could impose the death penalty") (emphasis added); Castro v. State, 644 So.2d 987, 989 (Fla.1994) (rejecting defendant's argument that the trial court impermissibly excused a juror for cause over defense objection when juror "ultimately said he was not sure he could follow the trial court's instructions [regarding the death penalty]") (emphasis added); Foster v. State, 614 So.2d 455, 462-63 (Fla.1992) (holding that trial court did not abuse discretion in excusing venireperson for cause who, "[w]hen asked whether she could set aside her feelings against the death penalty if the murder were sufficiently aggravated... responded that she was not sure that she could") (emphasis added).
Finally, Farina v. State, 680 So.2d 392, 396 (Fla.1996), sentence vacated, 763 So.2d 302 (Fla.2000), on which Morrison relies, is inapposite. The juror in question in Farina stated that she would try to be fair and that she would "fairly consider the imposition of the death penalty, depending on the evidence [she] heard in the courtroom," and, in fact, could impose a death sentence in a murder case, depending on the circumstances presented. Thus, although she had "mixed feelings" about capital punishment, she never expressed uncertainty about her ability to vote for it in a proper case, according to the appropriate legal standards. Moreover, the prosecutor in Farina never stated the grounds upon which he was challenging this juror, and the court apparently granted the State's challenge for the sole reason that the court had just granted a defense challenge. None of the bases supporting this Court's reversal in Farina apply to the instant case.
For the foregoing reasons, we find no manifest error and therefore conclude that the trial court did not abuse its discretion in excusing venireperson Staples for cause.
Next, Morrison claims the trial court erred in sustaining the peremptory strike of venirepersons who expressed some opposition to the death penalty, but who were not excusable for cause. Specifically, Morrison argues that the twelve-to-zero death recommendation in this case reflects that it is was produced by a jury wholly deprived of the voices of fellow jurors having some conscientious scruples about the death penalty and, accordingly, this Court should remand for a new penalty phase. We disagree.
This Court has stated, "[T]he State may properly exercise its peremptory challenges to strike prospective jurors who are opposed to the death penalty, but not subject to challenge for cause ... [because] [b]oth parties have the right to peremptorily strike `persons thought to be *444 inclined against their interests.'" San Martin v. State, 717 So.2d 462, 467-68 (Fla.1998) (quoting San Martin v. State, 705 So.2d 1337, 1343 (Fla.1997)) (quoting Holland v. Illinois, 493 U.S. 474, 480, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990)). Moreover, this Court has found that "discomfort with" the death penalty is a sufficient race-neutral reason for the State to exercise its peremptory strike. See, e.g., Walls v. State, 641 So.2d 381, 386 (Fla.1994) (holding trial court did not err in sustaining peremptory strike of venireperson who had "expressed discomfort with the death penalty") (citing Atwater v. State, 626 So.2d 1325, 1327 (Fla.1993)). It is clear from the record that Baugh and Jones each expressed unequivocal "discomfort" with the death penalty and, therefore, we find that the trial court did not err in sustaining the State's peremptory strikes.[3]
Next, during voir dire the prosecutor stated, "Do you all understand that you don't have to be 100 percent, absolutely convicted [sic] that this man committed the crime in order to return a verdict of guilty?" Morrison claims the prosecutor's remarks to the venire improperly minimized the State's burden of proof so as to violate Morrison's rights to a fair trial and to due process of law, an issue similar to that addressed by this Court in State v. Wilson, 686 So.2d 569 (Fla.1996). In Wilson, the trial judge made extemporaneous remarks to the venire regarding the State's burden of proof, including the following statement: "I repeat, stress, and emphasize, the State does not have to convince you to an absolute certainty of the defendant's guilt. Nothing is one hundred percent certain." Wilson, 686 So.2d at 570. We acknowledged that the trial judge's preliminary instruction on reasonable doubt in Wilson was "not incorrect, as such ... [but] it was at least ambiguous to the extent that it might have been construed as either minimizing the importance of reasonable doubt or shifting the burden to the defendant to prove that reasonable doubt existed." Id. This Court, however, went on to say, "Notwithstanding, in view of the fact that the trial judge gave the standard jury instruction on reasonable doubt at the close of the evidence and told the jury that it must follow the standard instructions, we cannot say that error was committed." Id.
The instant case involves a remarkably similar extemporaneous remark made by the prosecutor to the venire regarding the State's burden of proof. As we stated in Wilson, although such a statement may not be technically incorrect, it may be at least ambiguous to the extent that it might have been construed as either minimizing the importance of reasonable doubt or shifting the burden to the defendant to prove that a reasonable doubt existed. However, like the trial court in Wilson, the trial court in the instant case gave the standard jury instruction on reasonable doubt at the close of evidence and told the jury it must follow the standard instructions. Given that the trial court in the instant case also instructed the venire to disregard the statement and read the standard reasonable doubt instruction to the venire immediately following the prosecutor's comment, as well as re-read the reasonable doubt instruction while swearing in the jury, it stands to reason that the curative actions taken in the instant case were at least as effective as those taken by the trial judge in Wilson. See Williams v. State, 674 So.2d 155 (Fla. 4th DCA 1996) (holding any harm created by prosecutor's *445 statement that State's burden was not to prove guilt to "100 percent certainty" was cured by the court's curative instruction coupled with the fact that the court subsequently correctly charged the jury).[4]
Also, to the extent the prospective juror (Beard) was confused about the proper standard of proof,[5] the confusion was favorable to the defense, as this juror would have applied a higher standard of proof than that required by law. In addition, this prospective juror was peremptorily struck by the State and did not serve as a juror in this case; therefore, no harm occurred.
For the foregoing reasons, we find that any ambiguity in the prosecutor's extemporaneous comments to the venire regarding the State's burden of proof was clarified satisfactorily by an immediate instruction to disregard the statement and by subsequent readings by the court of the standard reasonable doubt instructions, such that the trial court did not err by not striking the panel.

Closing Argument
Next, Morrison argues that the prosecutor's remarks made during closing argument improperly shifted the burden of proof to the defense.[6] Counsel, however, failed to timely object during trial; therefore, the issue has not been preserved for appeal. See Clark v. State, 363 So.2d 331, 332 (Fla.1978) (holding a contemporaneous objection is required to preserve for appeal improper comment on defendant's right to remain silent).
Nonetheless, the prosecutor's first remarks were not an impermissible suggestion that the burden was on the defendant to prove his innocence (nor were they a comment on defendant's failure to testify), but rather only a direction for the jury to consider the evidence presented. Indeed, Morrison did claim in his statement to police that the victim had attacked Morrison and, in the process, the victim stabbed himself twice. Therefore, it was not inaccurate for the prosecutor to state that the defendant "would have us believe *446 that ... the elderly, disabled man attacked [Morrison], and that [Morrison] was forced to defend himself ... [and] in defending himself, [the victim] cut his own throat." Such a comment directing the jury to consider the evidence presented is not impermissible. See Barwick v. State, 660 So.2d 685, 694 (Fla.1995).
Moreover, the prosecutor's second remark, i.e., that the prosecutor had not yet "heard the defense in this case," was true, as this comment occurred chronologically before defense counsel had argued. Given the context of the prosecutor's remarks, i.e., during the prosecutor's closing argument and prior to defense counsel presenting his closing argument, the prosecutor was merely referring to the fact that defense counsel had not yet presented his argument. It was not a comment on the evidence presented by the defense, nor did it impermissibly shift the burden of proof to the defendant.

Motion to Suppress
Next, Morrison argues the trial court erred in denying his motion to suppress because police allegedly made illicit appeals to Morrison's religious beliefs. Morrison, however, testified at the motion to suppress hearing that he did not provide any inculpatory statements to police.[7] In order to preserve the issue for appellate review, a party must have made the same argument to the trial court that it raises on appeal. See Archer v. State, 613 So.2d 446, 448 (Fla.1993) (stating the issue "must be presented to the lower court and the specific legal argument or ground to be argued on appeal must be part of that presentation if it is to be considered preserved"); see also Woods v. State, 733 So.2d 980, 984 (Fla.1999); Tillman v. State, 471 So.2d 32, 35 (Fla.1985); Steinhorst v. State, 412 So.2d 332, 338 (Fla. 1982). Because Morrison did not argue the point he now raises below, he is foreclosed from raising that argument here. Thus, we find that the trial court did not err in denying Morrison's motion to suppress.

Impeachment of State Witness
Next, Morrison claims the trial court erred in sustaining the State's objection to a question purportedly seeking to impeach the State's witness for having a self-interest. "All witnesses who testify during a trial place their credibility in issue. Regardless of the subject matter of the witness' testimony, a party on cross-examination may inquire into matters that affect the truthfulness of the witness' testimony." Chandler v. State, 702 So.2d 186, 195 (Fla.1997) (quoting Charles W. Ehrhardt, Florida Evidence § 608.1, at 385 (1997 ed.)); see also Shere v. State, 579 So.2d 86, 90 (Fla.1991) (recognizing the general rule that the "purpose of cross examination is to elicit testimony favorable to the cross-examining party ... and to challenge the witness's credibility when *447 appropriate"). We have also stated, "Our evidence code liberally permits the introduction of evidence to show the bias or motive of a witness." Gibson v. State, 661 So.2d 288, 291 (Fla.1995). In relevant part, section 90.608(2), Florida Statutes (1997), states:
Any party, including the party calling the witness, may attack the credibility of a witness by: ...
(2) Showing that the witness is biased.
Professor Ehrhardt has stated, "Included within the types of matters that demonstrate bias are those that relate to the interest of the witness, favoritism, and corruption." Ehrhardt, supra § 608.5 at 445 (emphasis added).
The colloquy at issue in this case is the following:
[DEFENSE COUNSEL (Mr. Eler)]: Police ever tell you, ma'am, that when you were brought down and read your rights, detective ever tell you that he didn't believe you had nothing to do with this?
[PROSECUTOR]: Judge, I'm going to object to that.
[THE COURT]: Mr. Eler, I'll sustain that objection.
[DEFENSE COUNSEL]: Yes, sir.
Morrison argues that the purpose of defense counsel's question was to attack Brown's credibility by implying that Brown herself had been a suspect and had an interest in deflecting suspicion away from herself. As discussed, disclosing a witness's self-interest is a proper purpose of attacking the witness's credibility. As the State argues, however, defense counsel's question, on its face, attempts to improperly elicit the hearsay statement of a third party. This would be true if the statements of the detective or another police officer were offered to prove the truth of the matter asserted. § 90.801(1)(c) Fla. Stat. (1997) ("`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").
In this case, however, the testimony regarding statements made by the police or the detective may not necessarily have been offered to prove the truth of the matter asserted, but rather could have been offered to show what Brown's state of mind was at the time she made her statements to the police, thereby establishing that Brown believed herself to be a suspect (and thus had an interest in deflecting suspicion). See Chatman v. State, 687 So.2d 860, 862 (Fla. 1st DCA 1997) (holding that statements sought to be elicited from prosecution witness regarding statements made to him by law enforcement officers were not hearsay because they were offered to show witness's state of mind and possible bias at time he made statements implicating the defendant, and it was error to preclude defendant from questioning the prosecution witness regarding the statements made to him by law enforcement officers). In other words, an argument could be made that the statements made by the detective or other officers were not offered for their truth, but rather to illustrate the resulting self-interest that might occur from the fact that the statements were made. Therefore, such statements were admissible because they were relevant nonhearsay.
In this instance, however (and unlike the defendant in Chatman), defense counsel failed to advise the court that the question did not seek hearsay and was being offered to establish that Brown had an interest to deflect suspicion from herself and show bias toward the defendant. "If the relevancy of questions going to bias is not apparent from the question *448 itself, counsel has a duty to advise the court of relevancy." Ehrhardt, supra, § 608.5; see also Baker v. State, 517 So.2d 753 (Fla. 2d DCA 1987) (holding defense counsel's cross examination of key witness designed to show bias was not improperly limited where counsel failed to rephrase or proffer answer to question); Hernandez v. State, 360 So.2d 39, 40 (Fla. 3d DCA 1978) (holding trial court's denial of cross-examination of prosecution witness not error where defendant made no tender nor did he advise the court of the relevancy of questions to a showing of bias). Moreover, "[t]he decision as to whether a particular question properly goes to interest, bias, or prejudice lies within the discretion of the trial judge." Ehrhardt, supra § 608.5. Accordingly, because counsel failed to advise the court of the relevancy of the answer he was seeking, we find that the trial court did not abuse its discretion in sustaining the objection.[8]
Finally, any error in this instance is harmless beyond a reasonable doubt, because through another line of questioning, Morrison was given an opportunity to expose Brown's potential bias or self-interest. See Gibson v. State, 661 So.2d 288, 291 (Fla.1995); see also Chatman, 687 So.2d at 862 (holding error precluding defendant from questioning prosecution witness regarding statements made to him by law enforcement officer to show bias was harmless where defendant was able to elicit testimony through another line of questioning); Baker v. State, 517 So.2d 753 (Fla. 2d DCA 1987) (reasoning that because "alleged bias was demonstrated elsewhere during the trial ... any error in excluding the questioning concerning bias was harmless"). In this instance, Morrison's counsel was not stymied from undertaking another line of questioning with the witness to expose any alleged interest. Moreover, Detective Short testified on cross-examination that he had read Miranda[9] rights to Brown at the apartment and police station and he did feel that she "could possibly have played a role in it," thus providing ample opportunity for counsel to further expose Brown's alleged bias or self-interest.
Next, Morrison argues the trial court improperly excluded testimony intending to impeach the State's witness based on an alleged reputation for dishonesty. During trial, Morrison's counsel sought to introduce evidence of Sandra Brown's reputation for dishonesty through the testimony of Delores Tims.[10] The State objected, and *449 defense counsel proffered Tims' testimony. Finding no basis for her knowledge of Brown's reputation, other than her personal opinion of Brown, the trial court sustained the State's objection. Later, and after reviewing the transcript of the proffered testimony, the trial court announced it would adhere to its ruling because Tims' testimony constituted impermissible opinion evidence.
Pursuant to section 90.609, Florida Statutes (1997), a party may use character evidence to attack the credibility of a witness if the evidence relates to the witness's reputation for truthfulness. "However, a foundation must first be laid to establish that the person testifying as to the witness's reputation is aware of the witness's reputation for truthfulness in the community." Lott v. State, 695 So.2d 1239, 1242 (Fla.1997) (citing Charles W. Ehrhardt, Florida Evidence § 405.1 1995 ed.). "Essentially, it must be established that the community from which the reputation testimony is drawn is sufficiently broad to provide the witness with adequate knowledge to give a reliable assessment." Larzelere v. State, 676 So.2d 394, 400 (Fla. 1996). "Reputation evidence must be sufficiently broad-based and should not be predicated on `mere personal opinion, fleeting encounters, or rumor.'" Lott, 695 So.2d at 1242 (quoting Rogers v. State, 511 So.2d 526, 530 (Fla.1987)).
It is true that Tims initially seemed to be saying that her testimony was based on her knowledge of Brown's reputation in the community:
[DEFENSE COUNSEL]Q. So, you know her as Cassandra Brown?
[TIMS] A. Yes.
Q. All right. Ma'am, where do you live?
A. Where I live at now?
Q. Right.
A. Off Jammes.
Q. All right. This person Cassandra Brown, do you know her reputation in the community for truthfulness?
[PROSECUTION]: Objection. Improper predicate.
[THE COURT]: Okay. I'll overrule the objection for now.
BY [DEFENSE COUNSEL]: Q. You can answer the question. Do you know her reputation in the community for truthfulness?
A. She don't tell the truth.
Q. So, the answer is yes to that question?
A. Yes.
[THE COURT]: Those are two different questions.
[DEFENSE COUNSEL]: That's why we're doing this.
[TIMS]: Yes.
BY [DEFENSE COUNSEL]: Q. You know her reputation. What is that reputation; do you know?
A. For not telling the truth.
However, when questioned about her knowledge of Brown's reputation, Tims talked only about her own experience with Brown:
BY [PROSECUTION]: Q. Okay. Now, you say she had a reputation for not telling the truth; is that right?
A. Uh-huh.
Q. You know need to answer
A. Yes.
Q. Who have you talked with, sat down and talked with about her reputation?
A. I have never sat down with nobody to talk, like, against her. I just *450 heard them talking against her, and I done been in a situation, known that she had lied.
Q. All right. But nobody has ever come up to you and told you that Cassandra is a liar, have they?
A. Yes.
Q. They have?
A. Uh-huh, yes.
Q. How many people have you talked with about this?
A. Well, I had an incident with her with Raymond's sister when Sandra told a lie about some things that weren't true.
Q. You know of one instance in which Cassandra told a lie to Raymond's sister?
A. That's involving me in there, in that lie, yes.
Q. When was that?
A. That was in 96.
Q. 96.
What neighborhood were you living in at that time?
A. In Marietta.
Q. Marietta?
A. Uh-huh.
Q. And that's the only incident that you know about that you were personally involved in and knew that Cassandra had told a lie?
A. This right here, this case right here, because when she come to court it be a different story that she tells me that you all told her that I said this.
Q. All right. That's whatbased upon what she has told you?
A. Yes.
Q. All right. Not based upon what you have talked with Raymond's sister, or other people in the community?
A. No.
The trial court excluded such testimony because, in the court's view of her proffered testimony, she was basing her conclusion on her own personal experience of having caught Brown in a lie on one occasion rather than on Brown's reputation in the community:
[THE COURT]: Well, what I'm going to do as to that issue, I will sustain the objection and exclude it. This witness stated her opinion that she thinks Sandra Brown is not someone to be believed, but that's not the same as the basisshowing that she has a basis for knowing this witness' reputation.
She referred to two incidents where she was involved, and it's her opinion that Sandra Brown was not being truthful, but that's not the same as being truthful.
So, I understand your position. I'll sustain the objection.
. . . .
[THE COURT]: That's not what I heard her to say. She didn't have a basis for saying anything, other than her personal opinion as to Sandra Brown, whether she should be believed.
So, I'll sustain that.
. . . .
[THE COURT]: ... Before continuing with the trial, I'd like to make one observation. We discussed it earlier this morning. I ordered the transcript of the deposition testimony of Ms. Delores Tims on the issue of reputation testimony, and based on my reading of that transcript, I will adhere to my earlier ruling.
It's my ruling that Ms. Tims' opinion of the witness, Ms. Brown, is subject to her personal opinion that Mrs. Morrison Ms. Sandra Brown, rather, is someone not to believe. There is no basis for her opinion.

*451 That doesn't go to weight, it goes to admissibility, as I understand the Evidence Code.
The testimony proffered by Tims, as confusing as it was, was based on her personal experiences with Sandra Brown rather than on any broad-based knowledge of the community's opinion of Brown's reputation for truthfulness and, therefore, the required predicate was not established. See Larzelere, 676 So.2d at 399 (holding that reputation testimony based "largely on personal opinion and rumor" did not establish sufficient predicate to be admissible); see also Gamble v. State, 492 So.2d 1132 (Fla. 5th DCA 1986) (holding one learns of another's general reputation in a community through miscellaneous contact with many people). From the proffer as a whole, the trial court was justified in concluding that Tims really did not know Brown's reputation in the community, and she was testifying only about a specific act of lying with which Tims was personally familiar. Accordingly, and under these circumstances, the trial court did not abuse its discretion in finding an insufficient basis for the admission of the purported reputation evidence. See Heath v. State, 648 So.2d 660 (Fla.1994) (holding trial court has wide discretion in ruling on the admissibility of evidence and its rulings will not be disturbed absent an abuse of discretion).
Even were this Court to find that the trial judge abused his discretion in excluding the testimony, we would find such error harmless. See Larzelere, 676 So.2d at 400 (holding any error in excluding reputation testimony is harmless where other means of impeachment regarding truthfulness are available). In this instance, Tims' testimony would have likely been cumulative to that presented by Georgia Bell Morrison, who testified that she knew Brown's reputation in the community for truthfulness and that reputation was that she "is a big liar."

Motion for Judgment of Acquittal
Next, Morrison claims the trial court erred in denying his motion for judgment of acquittal as to first-degree murder and burglary. In Gordon v. State, 704 So.2d 107, 112 (Fla.1997), this Court noted:
We have repeatedly reaffirmed the general rule established in Lynch v. State, 293 So.2d 44 (Fla.1974), that:
[C]ourts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law.
Furthermore, we have stated:
"A judgment of conviction comes to this Court with a presumption of correctness and a defendant's claim of insufficiency of the evidence cannot prevail where there is substantial and competent evidence to support the verdict and judgment." Terry v. State, 668 So.2d 954, 964 (Fla.1996). The fact that the evidence is contradictory does not warrant a judgment of acquittal since the weight of the evidence and the witnesses' credibility are questions solely for the jury. Davis v. State, 425 So.2d 654, 655 (Fla. 5th DCA 1983); see generally Lynch v. State, 293 So.2d 44, 45 (Fla.1974) (holding that where reasonable minds may differ as to proof of ultimate fact, courts should submit case to jury). It is not this Court's function to retry a case or reweigh conflicting evidence submitted to the trier of fact. Tibbs v. State, 397 So.2d 1120, 1123 (Fla.1981), affirmed, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).
Donaldson v. State, 722 So.2d 177, 182 (Fla.1998).
*452 In the present case, the State sought a first-degree murder conviction on alternative theories of premeditated murder and felony-murder with the underlying offenses of robbery or burglary. Thus, because a general verdict form was used in this case, in order to affirm Morrison's first-degree murder conviction, there must be competent, substantial evidence supporting either premeditated or felony murder (predicated on robbery or burglary). See Jones v. State, 748 So.2d 1012, 1024 (Fla.1999) (citing Mungin v. State, 689 So.2d 1026, 1029-30 (Fla.1995)).
First, Morrison claims that the trial court erred in failing to grant a judgment of acquittal on the first-degree murder charge because the State failed to present sufficient evidence to support premeditated murder. Morrison argues evidence of premeditation was insufficient because the homicide erupted from the victim's spontaneous assault and, therefore, was not preplanned. "Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill." Green v. State, 715 So.2d 940, 943 (Fla.1998). Premeditation may "be formed in a moment and need only exist `for such a time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act.'" DeAngelo v. State, 616 So.2d 440, 441 (Fla.1993) (quoting Asay v. State, 580 So.2d 610, 612 (Fla.1991)). Premeditation can be shown by circumstantial evidence. See Woods v. State, 733 So.2d 980, 985 (Fla.1999). Whether the State's evidence fails to exclude all reasonable hypotheses of innocence is a question of fact for the jury. See Cochran v. State, 547 So.2d 928, 930 (Fla.1989). As this Court has stated:
Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.
Sochor v. State, 619 So.2d 285, 288 (Fla. 1993) (quoting Larry v. State, 104 So.2d 352, 354 (Fla.1958)).
In the instant case, there were two major knife wounds to the victim's neck. One was an incised wound from left to right across the victim's neck, and the other wound was a stab wound that was four and three-quarters inches long. In this second wound, the knife not only cut the victim's esophagus, but also nicked the vertebrae in the victim's neck. When describing a photograph of this wound to the jury, the medical examiner explained:
That shows the path of the stab wound that starts on the left side of the neck, and goes all the wall [sic] across and ends up almost behind the right ear and neck, some of cervical vertebra, goes through the esophagus, also through the xxx [sic] perform sinus which is the upper part of your voice box. It's a deep, long wound four and three-quarters of an inch long.
Given the nature of the weapon used and the manner in which the homicide was committed, as well as the nature and manner in which the wounds were inflicted, the jury was amply justified in concluding that it demonstrated Morrison's intent to kill. See Jimenez v. State, 703 So.2d 437, 440 (Fla.1997) (deliberate use of a knife to stab a victim multiple times in vital organs, alone, is evidence that can support a finding of premeditation).[11]
*453 Furthermore, even if Morrison had not intended to kill when he first entered the apartment, the jury was entitled to conclude that he "deliberately determined to kill before inflicting the mortal wound," Lowe v. State, 90 Fla. 255, 105 So. 829, 831 (1925), and that this intent existed for such time as to have allowed Morrison "to be conscious of the nature of the act [he was] about to commit and the probable result of the act." Buckner v. State, 714 So.2d 384, 387 (Fla.1998). As the trial court noted in its sentencing order, Morrison was a regular visitor to the apartment adjacent to the victim's; had the victim survived, he could have identified Morrison. This circumstance, coupled with the nature of the wounds inflicted plus the victim's inability to defend himself, belies any claim that the killing was unintentional or that Morrison was not conscious of the nature of his act or its probable result. Because reasonable jurors could reject Morrison's theory of non-premeditation and conclude that he committed premeditated murder, we find that the trial court did not err in denying Morrison's motion for judgment of acquittal as to premeditated murder.[12]
The State contends that even if the evidence did not support premeditated murder, the evidence does support Morrison's conviction based upon a felony murder theory. Morrison, however, argues that his conviction for first-degree murder may not stand because the evidence does not support two of the State's theories of guilt, i.e., premeditation and felony murder based on the underlying felony of burglary. But Morrison concedes that the evidence suffices to show that the murder was committed during a robbery, which is one underlying basis for felony murder identified in Morrison's indictment. Indeed, the jury also found Morrison guilty of a separate count of armed robbery. See San Martin v. State, 717 So.2d 462, 470 (Fla.1998) (holding "reversal is not warranted where the general verdict could have rested upon a theory of liability without adequate evidentiary support when there was an alternative theory of guilt for which the evidence was sufficient").
Second, Morrison's claim that the evidence of a burglary was insufficient fails because it is based on the erroneous premise the Morrison was an "invitee" into the victim's dwelling. According to Morrison's own statement, however, the victim told Morrison he could not come into the victim's apartment. Then, according to Morrison, when the victim went back into the apartment, Morrison "opened the door" and followed the victim to his bedroom. This does not constitute an invited entry, *454 and the mere fact that the victim failed to lock the door after closing it does not make Morrison's subsequent entry in any way consensual.[13]
For the foregoing reasons, we find that the trial court did not err in denying Morrison's motion for judgment of acquittal as to first-degree murder and burglary. Finding no reversible error as to the guilt phase of Morrison's trial, we affirm his convictions.

II. PENALTY PHASE

Heinous, Atrocious, or Cruel
Next, Morrison claims the heinous, atrocious, or cruel (HAC) aggravating circumstance instruction is unconstitutionally vague and, therefore, its application in this instance is in error. Claims that the HAC instruction is unconstitutionally vague, however, are procedurally barred unless a specific objection is made at trial on that ground. See Pope v. State, 702 So.2d 221, 224 (Fla.1997); see also James v. State, 615 So.2d 668, 669 (Fla.1993). According to Pope, the objection at trial must attack the instruction itself, either by submitting a limiting instruction or by making an objection to the instruction as worded. See id.
In the present case, Morrison failed to challenge the proposed jury instructions as being unconstitutionally vague; Morrison merely objected to the instruction being given because he didn't think "the evidence has shown a prima facie case to go to the jury on that." Therefore, because defense counsel failed to timely object that the proposed HAC jury instructions were unconstitutionally vague, Morrison failed to properly preserve this issue for appeal.
Notwithstanding the procedural bar to Morrison's claim, the instruction given to the jurors in the instant case is identical to those previously upheld by this Court. In Hall v. State, 614 So.2d 473, 478 (Fla. 1993), this Court determined that this particular jury instruction "defines the terms sufficiently to save both the instruction and the aggravator from vagueness challenges." See also Nelson v. State, 748 So.2d 237, 245-46 (Fla.1999); Walker v. State, 707 So.2d 300, 316 (Fla.1997); Chandler v. State, 702 So.2d 186, 201 (Fla.1997).
Morrison also challenges the court's application of the HAC aggravating circumstance to the facts of this case. In Finney v. State, 660 So.2d 674, 685 (Fla. 1995), however, this Court upheld application of the HAC aggravator where, according to the medical examiner, the victim was alive throughout the attack and ultimately died from drowning in her own blood. See id. Also in Finney, although the medical examiner could not say how long the victim lived, he made it clear that the victim was conscious and able to feel at least the first few stab wounds. See id. In this case, the victim was cut twice in the neck, one cut being deep enough actually to nick the victim's vertebrae. Furthermore, the injuries inflicted were massive; Morrison's own expert described the victim's injuries as "worse than a tracheotomy." Because his vocal cords were rendered useless, he could not talk or breathe, and he inhaled a massive amount of his own blood from the "tremendous hemorrhage." *455 Although the two experts disagreed about how long the victim may have remained alive, death clearly was not immediate, as the blood in the victim's nostrils could only have been caused by the victim trying to breathe in his own blood. The medical examiner testified that the victim died by effectively drowning in his own blood.
Finally, regardless of Morrison's intent to inflict pain on the victim, the means and manner in which death was inflicted in this case justify the HAC finding. See Brown v. State, 721 So.2d 274, 277 (Fla.1998) ("Unlike the cold, calculated and premeditated aggravator, which pertains specifically to the state of mind, intent and motivation of the defendant, the HAC aggravator focuses on the means and manner in which the death is inflicted and the immediate circumstances surrounding the death."); Guzman v. State, 721 So.2d 1155, 1160 (Fla.1998) (holding that the intention of the killer to inflict pain on the victim is not a necessary element of the HAC aggravator); Mahn v. State, 714 So.2d 391, 399 (Fla.1998) (rejecting defendant's contention that HAC did not apply because he did not deliberately inflict pain). Accordingly, we find that the trial court did not err in applying the HAC aggravating circumstance to the instant case.

Vulnerability Due to Advanced Age or Disability
Next, Morrison claims the statute and instruction for the aggravating circumstance that the victim of the capital felony "was particularly vulnerable due to advanced age or disability" is unconstitutionally vague and its application, in this instance, is an error. Under the authority of section 921.141(5)(m), Florida Statutes (1997),[14] the trial court instructed the jury to consider the victim's vulnerability as an aggravating circumstance, and the court found it proved. In its written sentencing order, the trial court found as a statutory aggravating circumstance that the victim of the capital felony was particularly vulnerable due to advanced age or disability:
The victim of the capital felony was particularly vulnerable due to advanced age or disability. The evidence established that the victim was eighty-one or eighty-two years old. The evidence also established that the victim had been totally disabled since childhood. The State has proved beyond any reasonable doubt that the victim was particularly vulnerable due to advanced age and disability. This aggravating circumstance was accorded great weight in determining the appropriate sentence in this case.
Morrison contends this aggravator is unconstitutionally vague and overbroad.
As a threshold inquiry, we must first determine whether Morrison's claim was preserved for appellate review in accord with established law. Although no court has specifically addressed the requirements to preserve a vagueness claim for the "vulnerable victim" statutory aggravator, there is sufficient guidance available from this Court's decisions regarding the requirements to preserve claims of unconstitutional vagueness with respect to other statutory aggravating circumstances. For example, in Pope v. State, 702 So.2d 221, 223-24 (Fla.1997), this Court addressed the preservation issue with regard to a *456 claim that the instruction for the statutory aggravating factor of cold, calculated, and premeditated (CCP) was unconstitutionally vague and held:
[W]e have made it clear that claims that the CCP instruction is unconstitutionally vague are procedurally barred unless a specific objection is made at trial and pursued on appeal. The objection at trial must attack the instruction itself, either by submitting a limiting instruction or making an objection to the instruction as worded.
See also Downs v. State, 740 So.2d 506, 517 (Fla.1999) (holding claim that three statutory aggravators (i.e., those found in section 921.141(5)(b), (f), and (i)) were unconstitutionally vague was procedurally barred on appeal "[b]ecause defense counsel did not object to these instructions during trial [footnote omitted] or propose alternative instructions").
At the time the "vulnerable victim" instruction was read to the jury, defense counsel neither submitted a limiting instruction nor specifically objected that this instruction was unconstitutionally vague, as this Court required in Pope. Rather, based on the colloquy that took place during the charge conference, it appeared as though defense counsel agreed with its applicability:
[Defense Counsel]: Your honor, page three, my understanding of number five, the victim of capital felony was particularly vulnerable due to the age; my understanding was this was in effect at the time of this particular offense. So, therefore, it would be applicable.[15]
Accordingly, we find that defense counsel did not preserve this issue for appellate review and, therefore, we dismiss Morrison's claim without addressing the merits.[16]

Proportionality
Finally, Morrison claims the imposition of the death penalty in this case is disproportionate. Due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a proportionality review. See Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990). In deciding whether death is a proportionate penalty and to ensure uniformity in the imposition of the death sentence, this Court reviews and considers all the circumstances in a case relative to other capital cases. See Johnson v. State, 720 So.2d 232, 238 (Fla.1998); Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998). The death penalty is reserved only for those cases where the most aggravating and least mitigating circumstances exist. See Kramer v. State, 619 So.2d 274, 278 (Fla.1993).
In the present case, the trial court found four aggravating circumstances: (1) Morrison was previously convicted of a felony involving the use or threat of violence to the person;[17] (2) the crime for which Morrison *457 was to be sentenced was committed while he was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit the crime of armed robbery or burglary with an assault or both; (3) the crime for which Morrison was to be sentenced was especially heinous, atrocious, or cruel; and (4) the victim of the capital felony was particularly vulnerable due to an advanced age or disability.
Morrison did not present evidence of any of the statutory mitigating circumstances listed in section 921.141(6)(a)-(g), Florida Statutes (1997). The trial court, however, found the following nonstatutory mitigating circumstance and afforded it "great weight": Morrison's low intellectual ability combined with drug and alcohol abuse would result in exercise of bad judgment. The trial judge also found several other nonstatutory mitigating circumstances and afforded them "some weight," including: Morrison's good jail conduct; the fact that there was no parole or other release available to Morrison; Morrison's cooperation with police; Morrison's abuse of alcohol and use of cocaine; Morrison's employment; Morrison's assumption of familial responsibility at an early age; and Morrison's positive adjustment while incarcerated.
After considering and weighing the aggravating and mitigating circumstances found to exist in this case, the trial court found:
[T]he aggravating circumstances present in this case far outweigh the mitigating circumstances found to exist. The Court further finds that the sole aggravating factor that the Defendant has been previously convicted of two (2) prior violent felonies, as well as any combination of aggravating factors, substantially outweighs the mitigating [sic] found to exist.
Morrison argues that the death penalty is disproportionate here because he did not enter the dwelling with the premeditated design to kill the victim, and the killing of the victim was an impulsive action in response to the victim's resistance to the robbery. In Mendoza v. State, 700 So.2d 670, 679 (Fla.1997), however, this Court rejected a strikingly similar argument, where the defendant argued that the death penalty was disproportionate "because the murder was not planned but was committed on the spur of the moment during a robbery gone awry," and that "the shooting of [the victim] was a reflexive action in response to [the victim's] resistance to the robbery." Rather, this Court affirmed the defendant's death sentence in Mendoza based upon only two of the four aggravating factors found against Morrison (i.e., previous conviction of a violent felony and commission of the murder during a robbery). See Mendoza, 700 So.2d at 672; see also Carter v. State, 576 So.2d 1291, 1293 (Fla.1989) (rejecting argument that death penalty was disproportionate because it was merely a case of a "robbery gone bad" when court found three aggravating circumstances which far outweighed the nonstatutory mitigating circumstances of the defendant's deprived childhood).
Moreover, this Court has upheld death sentences in other cases similar to this one, even where at least some statutory mitigation was presented. See, e.g., Bates v. State, 750 So.2d 6, 12 (Fla.1999) (holding death penalty proportionate in stabbing death where court found three aggravators, including that the murder was committed *458 during kidnaping and sexual battery, was committed for pecuniary gain, and was HAC, versus two statutory mitigators and several nonstatutory mitigators and where testimony also indicated some neurological impairment of defendant); Pope v. State, 679 So.2d 710 (Fla.1996) (holding death penalty proportionate in stabbing death where two aggravating factors of commission for pecuniary gain and appellant's prior violent felony conviction outweighed two statutory mitigating circumstances of commission while under the influence of extreme mental or emotional disturbance and impaired capacity to appreciate the criminality of the conduct, as well as nonstatutory mitigating circumstances of intoxication and that defendant acted under the influence of mental or emotional disturbance); Spencer v. State, 691 So.2d 1062, 1063-65 (Fla.1996) (holding death penalty proportionate where victim beaten and stabbed and court found two aggravators of prior violent felony and HAC versus two statutory mental mitigators plus drug and alcohol abuse and paranoid personality).
After carefully considering the totality of the circumstances in this case in light of this Court's prior decisions in other capital cases, we accept the jury's recommendation and the trial judge's weighing of the aggravating and mitigating evidence and, thus, find that death is a proportionate penalty in this case.
For the reasons stated, we affirm Morrison's convictions and sentences.
It is so ordered.
WELLS, C.J., and HARDING and LEWIS, JJ., concur.
PARIENTE, J., concurs in result only with an opinion.
QUINCE, J., concurs in result only with an opinion, in which SHAW and PARIENTE, JJ., concur.
ANSTEAD, J., concurs in result only.
PARIENTE, J., concurring in result only.
I concur in result only because I share Justice Quince's concerns regarding the methods of interrogation in this case and also because I disagree with the majority's statements that the HAC aggravator does not require an intent element. See majority op. at 455. With regard to the majority's statements concerning the HAC aggravator, I rely on my reasoning in Francis v. State, 818 So.2d 110, 142-44 (Fla.2001) (Pariente, J., concurring in result only).
QUINCE, J., concurring in result only.
While I believe that under the unique facts of this case, the trial court did not err in denying the motion to suppress Morrison's statements to Officer Short and his confession,[18] I write to express my concern about the interrogation techniques used by the police in this case and particularly the use of an officer who is a minister in interrogating the defendant. Prior to trial Morrison filed a motion to suppress and alleged, inter alia, that the statements made to Reverend Richardson (Officer Richardson) were made in his capacity as a minister and thus privileged. He also alleged other statements were not free and voluntary but they were the result of threats, promises, intimidation, and inducements and the product of statements *459 made by and to Officer Richardson. At the hearing on the motion to suppress, Morrison denied making any verbal confessions to the police. Morrison also testified concerning his use of drugs on the night of the murder. He indicated he asked for an opportunity to call his father and said he did not ask to speak with Officer Richardson. However, the three officers who testified, including Officer Richardson, stated Morrison made oral statements admitting his guilt in addition to signing a written confession. Furthermore, the officers said Officer Richardson was brought back to the station because Morrison wanted to talk with him.
The hearing began with the testimony of Officer Richardson. The focus of the cross-examination of Richardson concerned his dual role as a police officer and a minister. Richardson, in his role as a police officer, arrested the defendant. However, en route from the point of arrest to the police station, Richardson initiated a conversation with Morrison concerning religion and the need to repent and change his lifestyle.[19] Richardson advised the defendant to tell the detectives the truth. Once Richardson and Morrison arrived at the police station, the defendant was not arrested on the outstanding warrant on which Richardson had been instructed to arrest Morrison but was instead taken to a homicide interrogation room and turned over to the lead homicide detective, Officer Short.
Officers Short and Davis interrogated Morrison for hours. At one point Officer Davis lost his temper and left the room. During the time that Officer Short interrogated Morrison alone, the subject of religion was discussed for a ten- to fifteen-minute period. Thereafter Morrison either asked to pray or Short offered Morrison the opportunity to pray. In either event, Morrison was taken to the chapel, both Morrison and Short knelt, and Morrison prayed aloud. During that prayer, Morrison made statements to the effect that he had done something terrible, something worse than he had ever done, and he would leave it to the Lord to decide how much to tell the police. It was allegedly at this point that Morrison asked to talk with Officer Richardson, the person Morrison called the "preacher policeman." And it was after Richardson came back to the station and talked with Morrison privately for over an hour that Morrison made statements to Short and signed the confession.
The overall effect of these types of activities by the police gives the appearance of the kind of police impropriety and coercion that has been condemned by the United States Supreme Court. See Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). Often there is a thin line separating police coercion and a defendant's voluntary statements after a religious discussion. When the mix is further complicated by the fact that the officer doing the interrogation is a man of the cloth, that line of separation becomes even thinner because the question arises as to whether the defendant was talking to the officer or the cleric. While that issue was resolved in this case by suppression of statements made to Officer Richardson, there is always the added possibility that the "fruit of the poisonous tree" doctrine could result in suppression of other evidence or statements under the proper circumstances. Thus, I believe that the police should proceed with extreme caution in these situations where a police officer *460 interrogates a suspect under the guise of offering spiritual counseling.
SHAW and PARIENTE, JJ., concur.
NOTES
[1] Morrison raises twelve issues on appeal: (1) whether the trial court erred in failing to adequately address Morrison's request for new counsel prior to trial; (2) whether the trial court erred in excusing a venireperson for cause because he was unsure if he would be able to vote for a death sentence if selected as a juror; (3) whether the trial court erred in sustaining the peremptory strike of venirepersons who expressed some opposition to the death penalty, but who were not excusable for cause; (4) whether the prosecutor's remarks to the venire improperly minimized the State's burden of proof so as to violate Morrison's rights to a fair trial and to due process of law; (5) whether the prosecutor's remarks made during closing argument improperly shifted the burden of proof to the defense; (6) whether Morrison's statements to police, induced by a law enforcement officer's appeal to Morrison's religious beliefs, were voluntary, such that the trial court did not err in denying Morrison's motion to suppress; (7) whether the trial court erred in sustaining the State's objection to a question purportedly seeking to impeach the State's witness for having a self-interest; (8) whether the trial court improperly excluded testimony intending to impeach the State's witness based on an alleged reputation for dishonesty; (9) whether the trial court erred in denying Morrison's motion for judgment of acquittal as to first-degree murder and burglary; (10) whether the heinous, atrocious, or cruel aggravating circumstance statute is unconstitutionally vague and, therefore, its application in this instance is in error; (11) whether the statute and instruction for the aggravating circumstance that the victim of the capital felony "was particularly vulnerable due to advanced age or disability" is unconstitutionally vague and its application, in this instance, is an error; and (12) whether the imposition of the death penalty in this case is proportionate.
[2] Defense counsel asked Staples no questions about his feelings towards the death penalty or his ability to vote for it, and made no attempt to rehabilitate Staples. Defense counsel was not prevented from doing so, as was counsel in Sanders v. State, 707 So.2d 664 (Fla.1998); he simply chose not to.
[3] We also find Morrison's claim to be procedurally barred because Morrison accepted the jury without renewing his challenge. See Hudson v. State, 708 So.2d 256, 262 (Fla. 1998) (citing Joiner v. State, 618 So.2d 174 (Fla.1993)).
[4] Moreover, on several occasions during voir dire in the instant case, the prosecutor emphasized it would be the trial judge who would explain the legal definition of reasonable doubt and it is the trial judge's duty to instruct the jury regarding the law.
[5] When the State questioned whether Beard understood the burden after the court's earlier instruction, the court stepped in:

[BY THE COURT]: You could follow the instruction as to the state's burden, is that correct?
Understanding the State has to prove its case beyond and to the exclusion of a reasonable doubt, you used the term a hundred percent. As I indicated earlier, we don't try to quantify into percentages.
[BEARD]: He's one said a hundred percent [sic] earlier.
[BY THE COURT]: Yes, sir, we did say that earlier. That's why we try to avoid that.
Beard said he understood, and he would and could convict upon proof beyond a reasonable doubt.
[6] During the State's closing argument, the prosecutor made the following statement:

[1] The defense, or defendant would have us believe that this elderly, disabled man attacked him, and that he was forced to defend himself. And that in defending himself, Albert Dwelle cut his own throat, twice. I guess that's what they want us to believe.
[2] I haven't heard the defense in this case. I'm interested in hearing it, and I know you all are interested in hearing it. I'm eager to hear what Mr. Eler [defense counsel] has to say when he gets up here, because I haven't heard the defense yet in this case. I haven't heard their response, yet, to this, other than he's not guilty. That's what they told you, he's not guilty. Well, I'm eager to hear it, because not only is there no reasonable doubt in this case, there is no doubt whatsoever that this man did it. None whatsoever.
[7] The following colloquy took place during the motion to suppress hearing:

[Prosecutor]: Did you not ultimately tell them that you had been in Albert Dwelle's apartment?
[Morrison]: No.
[Prosecutor]: You never told them you went in there?
[Morrison]: Never.
[Prosecutor]: You never said that Mr. Dwelle cut his own throat?
[Morrison]: No, sir.
[Prosecutor]: You never said that you wanted to get money out of his shirt?
[Morrison]: No, sir, I didn't.
[Prosecutor]: But you signed a confession saying that?
[Morrison]: Yes. But I didn'tat the time I didn't knowI didn't even read the confession.
[8] Furthermore, "[s]ection 90.104(1)(b), provides that when a trial judge erroneously sustains an objection, counsel, in order to preserve the point for appeal, must make an offer of proof of how the witness would have responded if allowed to answer the question." Ehrhardt, supra, § 104.3 (emphasis added); see also Lucas v. State, 568 So.2d 18, 22 (Fla.1990) (holding evidentiary error in capital sentencing proceeding was not preserved for appeal when "[t]he defense did not proffer what the witness would have said if allowed to answer the question"); Browder v. Da Costa, 91 Fla. 1, 109 So. 448, 451 (1925) ("When an objection is sustained to a question, and the witness is not permitted to answer, unless it plainly appears from the question propounded that the answer of the witness would be relevant, it is the duty of the party propounding the question to make a sufficient proffer of what he intends to prove by the witness in answer to the objectionable question, so that the court below, and subsequently this court, can determine whether or not the proposed evidence would be material. Otherwise the error is not made to appear."); Nava v. State, 450 So.2d 606, 609 (Fla. 4th DCA 1984) (purpose of requiring proffer is so that on appellate review the court will not be required to speculate on the excluded evidence).
[9] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[10] Sandra Brown is a State witness who provided testimony placing Morrison near the victim's apartment at time of homicide. Delores Tims stated she lives "off Jammes," apparently in the vicinity of Sandra Brown.
[11] Moreover, Morrison's statement that the victim stabbed himself twice during a struggle with Morrison while trying to prevent a robbery is not credible, especially given the severity of the wounds and the victim's age and severe disabilities. The circumstantial evidence standard does not require the jury to believe the defendant's version of events on which the State has produced conflicting evidence. See Crump v. State, 622 So.2d 963, 971 (Fla.1993).
[12] Morrison relies upon Kirkland v. State, 684 So.2d 732 (Fla.1996), where this Court found insufficient evidence in the record to support the finding of premeditation necessary to sustain defendant Kirkland's first-degree murder conviction. Kirkland, however, was "mildly retarded" and "there was no suggestion that Kirkland exhibited, mentioned, or even possessed an intent to kill the victim at any time prior to the homicide." Kirkland, 684 So.2d at 734-35. Morrison is not mildly retarded and, given the nature of the weapon used and the manner in which the homicide was committed, as well as the nature and manner in which the wounds were inflicted, the jury was amply justified in concluding that it demonstrated Morrison's intent to kill. Moreover, ample evidence was presented that Morrison did not have any money just prior to homicide and he, by his own admission, was seeking money for crack. Therefore, it cannot be said that there was "scant, if any, evidence" to indicate Morrison committed the homicide according to a preconceived plan as considered by the Kirkland Court.
[13] Therefore, Morrison's reliance on Delgado v. State, 776 So.2d 233 (Fla.2000), is misplaced, because this is not an instance where a defendant initially has consent to enter the dwelling and then that consent is subsequently withdrawn. In the instant case, the State maintained that Morrison never had consent to enter the victim's apartment. Thus, the jury was never asked to consider a "legally inadequate" theory of burglary as was at issue in Delgado.
[14] Section 921.141(5)(m), Florida Statutes (1997), states:

AGGRAVATING CIRCUMSTANCESAggravating circumstances shall be limited to the following:
. . . .
(m) The victim of the capital felony was particularly vulnerable due to advanced age or disability, or because the defendant stood in a position of familial or custodial authority over the victim.
[15] During closing argument, defense counsel even appeared to acknowledge the likely applicability of the "vulnerable victim" statutory aggravator to the case: "Yes, [the victim], he had polio disability, and he was older. Should that be given some weight? Possibly."
[16] Moreover, any suggestion that Morrison's pretrial motion objecting the vagueness of the "vulnerable victim" statutory aggravating factor instruction preserved his objection to the instruction given to the jury ignores the settled rule of Florida procedure that, in order to preserve an objection, a party must object after the trial judge has instructed the jury. See, e.g., Harris v. State, 438 So.2d 787, 795 (Fla.1983).
[17] Morrison was convicted of attempted robbery on September 27, 1988. In connection with this conviction, Mike Holton, an officer with the Hamilton County Sheriff's Office, testified that during a 1988 robbery, Morrison struck an older man ("I think he was in his 60's") in the jaw, broke the man's false teeth, and took the man's wallet. Morrison was also convicted of aggravated battery on July 15, 1991.
[18] The trial court granted the motion to suppress in regard to statements made by the defendant to Officer Richardson.
[19] Officer Richardson indicated in his testimony at the suppression hearing that he generally talked with arrestees concerning religion by sharing with them the news of Christ.