PER CURIAM.
 

 This case is before this Court on appeal from the judgment of the trial court convicting Derrick McLean of first-degree murder and sentencing him to death.
 
 [1]
 
 For the reasons that follow, we affirm his conviction and sentence.
 

 I. FACTS AND PROCEDURAL BACKGROUND
 

 Derrick McLean was sentenced to death for the November 2004 murder of Jahvon Thompson. The jury found McLean guilty of first-degree felony murder, attempted home invasion robbery with a firearm, attempted first-degree murder, kidnapping with intent to commit a felony with a firearm, and attempted robbery with a firearm.
 

 The evidence at trial revealed that on November 24, 2004, McLean, along with his cousin, Maurice Lewin, and acquaintance, James Jaggon, drove to the apartment where the victim, fifteen-year-old Jahvon Thompson, lived with his father in Orlando. McLean, Lewin, and Jaggon planned that morning to rob the apartment of marijuana or money or both. On the way to the apartment, the three men agreed that McLean and Jaggon would commit the robbery and Lewin would wait in the car. Although all three men had guns, there was no discussion of shooting or killing anyone during the commission of the robbery. McLean and Jaggon, each armed with a gun, knocked on the victim’s door and, when the victim opened the door, rushed into the apartment. McLean was wearing a black baseball cap and batting gloves, and Jaggon was wearing a ski mask. Lewin remained nearby in the car, his gold Buick, and maintained an open line between his Samsung cell phone and McLean’s Nokia cell phone.
 

 Meanwhile, the victim’s next-door neighbor, Theothlus Lewis, heard loud noises he thought might be music coming from Thompson’s apartment. Lewis told his girlfriend that he was going over to Thompson’s apartment to ask him to turn down the music. When Lewis knocked on the door, McLean opened the door, brand
 
 *1048
 
 ished a gun, and motioned for Lewis to enter the apartment. When Lewis entered the living room area, McLean asked him “where was the money at,” and Lewis turned his pockets inside-out, revealing he had nothing.
 

 Then, Lewis saw Jahvon Thompson and Jaggon come from the hallway. Both Thompson and Lewis were ordered to sit on the couch. While McLean searched the apartment, Jaggon held Lewis and Thompson at gunpoint. At some point, McLean grabbed a blue pillow sham from a shelf and ordered Jaggon to leave the apartment, telling him to shoot the female next door if he saw her. Lewis testified that he sensed danger from the look in McLean’s eyes, so he dove to the floor, crawling toward the back of the apartment. McLean shot at Lewis, hitting him once in the back, and then fired several more shots at Thompson. The medical examiner found that each of the three gunshots to Thompson’s chest would have been fatal. After waiting for McLean to leave, Lewis returned to his apartment, where his girlfriend and her daughter had already called 911.
 

 Meanwhile, Lewin and Jaggon drove off, McLean left the scene on foot, and the three men met up at a nearby restaurant. McLean, still carrying the blue pillow sham from the apartment, got into the car with Lewin and Jaggon, and Lewin pulled the car out onto the road. A police officer, who was driving an unmarked car in the vicinity and had been notified of the shooting, saw the gold Buick pass by, and he activated his lights and initiated pursuit. Lewin sped up and attempted to elude the officer but soon crashed into the marked patrol car of a sheriffs deputy who was investigating an unrelated incident nearby. The deputy, who was in his marked car, saw the Buick coming at him and ran from his vehicle in order to get out of the way. Lewin’s car struck the marked car, sending it into the deputy, who was struck in the hip and thrown fifteen to twenty feet. The deputy saw Jaggon sitting in the front passenger seat of the Buick. He also saw McLean running from the Buick.
 

 Additional law enforcement arrived on the scene of the crash. Officers who searched the area discovered a batting glove, black baseball cap, Nokia cell phone, shirt, and handgun discarded in the woods adjacent to the crash. A blue pillow sham containing marijuana was found in the backseat of Lewin’s Buick. McLean’s DNA was later detected on the shirt, pillow sham, and batting glove. The Nokia cell phone discovered in the woods near the crash was determined to be registered to McLean’s girlfriend. Cell phone records revealed calls between this Nokia phone and Lewin’s phone on the day of the crime. The Nokia phone also contained images of a semiautomatic firearm.
 

 At trial, Lewin and Jaggon testified that the weapon McLean carried during the crimes was a .380. Eight shell casings found in the victim’s apartment were consistent with having been fired from a .380 Hi-Point semiautomatic. About six months after the crime, law enforcement found a .380 Hi-Point semiautomatic in the woods about fifteen feet from the road where the crash had occurred. This handgun appeared to be the weapon in the images found on McLean’s cell phone.
 

 The day after the crimes, Lewis worked with a police sketch artist to develop a composite of his shooter. Over the next few days, the Orlando Police Department showed Lewis three photo lineups — none including McLean, whose identity they had not yet learned — but Lewis did not recognize any of the individuals as the shooter. On December 1, Jaggon’s father told the police that a third man, who was Lewin’s cousin and named Derrick, was involved in
 
 *1049
 
 the crime. A crime line tip also implicated a person named Derrick and provided information about where he lived, and this information led police to identify McLean as a suspect in the crime.
 

 On December 9, police showed Lewis another photo lineup — this one containing McLean — and Lewis identified McLean as the shooter. Lewis said he was 90% certain about his identification but would be absolutely sure if he saw the suspect in person. Police then took McLean into custody for violation of probation, questioned him briefly about the murder, and arranged a live lineup of six individuals from which Lewis identified McLean as the shooter. Lewis also made an in-court identification of McLean as the man who shot him.
 

 At trial, Jaggon and Lewin testified against McLean as part of their plea agreements for charges related to the events of November 24, 2004.
 
 [2]
 
 Jaggon and Lewin gave consistent accounts of McLean’s participation in the crime. Lewin also testified that when he asked McLean why he fired shots during the robbery, McLean replied that he “wanted to feel like what it feels like to shoot and kill somebody.”
 

 During the penalty phase, the defense offered expert testimony regarding McLean’s psychological, mental, and emotional health as well as testimony from McLean’s older brother. One defense psychologist diagnosed McLean with an organic brain impairment, although the psychologist had no medical records or diagnostic studies to confirm any brain injury. Another defense psychologist testified that McLean had some history of substance abuse and functioned at the emotional level of an adolescent. Both psychologists diagnosed McLean with borderline personality disorder but found that he was of average intelligence. McLean’s brother testified to a history of some family dysfunction.
 

 The jury voted nine to three in favor of a death sentence. After conducting a Spencer
 
 [3]
 
 hearing, the trial court followed the jury’s recommendation, finding that the three aggravating factors outweighed several mitigating factors. Of the aggra-vators, the court found (1) that when McLean committed the murder, he had been previously convicted of a felony and placed on felony probation (moderate weight); (2) that McLean was previously convicted of a felony involving the use or threat of violence, based on McLean’s prior armed robbery conviction and the contemporaneous conviction for the attempted first-degree murder of Lewis (great weight); and (3) that McLean committed the murder during the commission of a robbery (great weight). The trial court found two statutory mitigating circumstances: (1) McLean’s mental or emotional disturbance at the time of the crime (little weight); and (2) McLean’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law (little weight). The court also found six categories of nonstatutory mitigating circumstances: (1) mental health issues (no weight); (2) substance abuse issues (little weight); (3) disparate treatment of code-fendants (no weight); (4) family problems (little weight); (5) brain injury (little weight); and (6) miscellaneous factors, such as poor grades in high school, good
 
 *1050
 
 behavior in court, and lack of positive role models in his youth (little weight).
 

 II. ISSUES RAISED ON APPEAL
 

 McLean claims that (A) the trial court erred by admitting photographic and live lineup identifications when law enforcement did not offer assistance of counsel; (B) the trial court erred in conducting a portion of the Nelson
 
 [4]
 
 hearing in camera, outside McLean’s presence; (C) the trial court erred in instructing the jury on the avoid arrest aggravator; and (D) McLean’s death sentence is disproportionate.
 
 [5]
 
 None of these claims warrant relief.
 

 A. Motion to Suppress Lineup Identifications
 

 McLean first claims that the trial court erred in denying his motion to suppress photographic and live lineup identifications because law enforcement did not offer assistance of counsel. We disagree.
 

 Here, the trial court’s ruling on the motion to suppress was proper. Because both the photographic and live lineups occurred before any charges were filed against McLean, they were not critical stages of proceedings and did not trigger a right to counsel.
 
 See Ibar v. State,
 
 938 So.2d 451, 469-70 (Fla.2006) (“The pre-arrest investigatory lineup ... was not a ‘critical stage’ of the proceedings because when the lineup was conducted, it was not apparent that the government had decided to prosecute [the defendant].... ”). Because McLean was not entitled to the presence of counsel during these investigatory lineups, his rights were not violated when law enforcement failed to offer assistance of counsel. Accordingly, we affirm the trial court’s denial of McLean’s motion to suppress the results of the lineup identifications.
 

 B. The Nelson Hearing
 

 Next, McLean argues that that the trial court erred in conducting a portion of the
 
 Nelson
 
 hearing in camera, outside McLean’s presence. We disagree.
 

 Before trial, McLean sent a letter to the trial court requesting that he be assigned new counsel, and the trial court held a
 
 Nelson
 
 healing to consider McLean’s several grievances. During the
 
 Nelson
 
 hearing, McLean told the court that he had provided his counsel with the names of alibi witnesses but that “they never wanted to go speak to the people.” The trial court allowed defense counsel to respond in camera, outside the earshot of McLean or the State, to that particular issue so that it would not be on record with the State. Defense counsel adequately explained, to the trial court’s satisfaction, her investigator’s discussions with the alibi witnesses identified by McLean and her decision not to pursue then1 use as witnesses.
 

 No error occurred when McLean could not hear a portion of the
 
 Nelson
 
 hearing proceedings because McLean was not entitled to a
 
 Nelson
 
 hearing on the issue being discussed. This Court has held that a defendant is not entitled to a
 
 Nelson
 
 hearing “where a defendant presents general complaints about defense counsel’s trial strategy and no formal allegations of incompetence have been made.”
 
 Moirison
 
 
 *1051
 

 v. State,
 
 818 So.2d 432, 440 (Fla.2002);
 
 see also Sexton v. State,
 
 775 So.2d 923, 931 (Fla.2000) (holding that the defendant was not entitled to a
 
 Nelson
 
 hearing when he “was merely noting his disagreement with his attorney’s trial strategy ... and was not asserting a sufficient basis to support a contention that his attorney was incompetent”). Here, McLean’s argument regarding the alibi issue raised disagreement with trial strategy and did not assert a sufficient basis to support a contention that his attorneys were incompetent.
 
 See Morrison,
 
 818 So.2d at 442. Furthermore, as in
 
 Morrison,
 
 818 So.2d at 442, the trial court made “sufficient inquiry to determine whether there was reasonable cause to believe that counsel was not rendering effective assistance.” Therefore, we find McLean’s
 
 Nelson
 
 argument to be without merit.
 

 C. Jury Instruction on the Avoid Arrest Aggravator
 

 McLean also claims that the trial court erred in instructing the jury on the avoid arrest aggravator, which the trial court ultimately rejected. We disagree.
 

 Florida law provides that “evidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant and shall include matters relating to any of the aggravating or mitigating circumstances.” § 921.141(1), Fla. Stat. (2004). Then, the trial court must instruct the jury on any aggravators for which competent substantial evidence is received.
 
 Aguirre-Jarquin v. State,
 
 9 So.3d 593, 607 (Fla.2009)
 
 petition for cert. denied,
 
 — U.S. -, 130 S.Ct. 1505, — L.Ed.2d - (2009).
 

 The avoid arrest aggravating circumstance applies when “[t]he capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.” § 921.141(5)(e), Fla. Stat. (2004). When the victim is not a law enforcement officer, the evidence must demonstrate beyond a reasonable doubt that “the sole or dominant motive for killing was to eliminate a witness.”
 
 Bevel v. State,
 
 983 So.2d 505, 518 (Fla.2008) (quoting
 
 Buzia v. State,
 
 926 So.2d 1203, 1209 (Fla.2006)). This Court has held that the evidence presented on the avoid arrest aggravator may be in the form of “circumstantial evidence from which the motive for the murders may be inferred.”
 
 Hoskins v. State,
 
 965 So.2d 1, 19 (Fla.2007) (quoting
 
 Farina v. State,
 
 801 So.2d 44, 54 (Fla.2001)).
 

 Here, the State presented competent substantial evidence to support the avoid arrest aggravator. The victims were compliant and helpless when McLean shot them, and McLean had obtained the marijuana and was exiting the apartment when he fired the fatal shots. Such circumstances suggest that the shooting was intended to eliminate the witnesses.
 
 See Thompson v. State,
 
 648 So.2d 692, 695 (Fla.1994) (“Once Thompson had obtained the $1,500 check from Swack and Walker, there was little reason to kill them other than to eliminate the sole witnesses to his actions.”). Also, McLean had instructed Jaggon to shoot the woman next door if he saw her, further indicating McLean’s intent to eliminate any potential witnesses. During the crime, McLean did not wear a mask or otherwise disguise his appearance, making a subsequent identification by one of the victims likely if McLean did not eliminate the witnesses.
 

 With these facts presented, the jury instruction on this aggravator was not error. That the tidal court later declined to find the aggravator does not render the jury instruction improper.
 
 See, e.g., Davis v. State,
 
 928 So.2d 1089, 1132 (Fla.2005) (rejecting the defendant’s claim that “the trial court erred in allowing the jury to consider
 
 *1052
 
 the avoiding or preventing a lawful arrest aggravator when the trial court found that this aggravating circumstance did not exist”);
 
 Pace v. State,
 
 854 So.2d 167, 181 (Fla.2003) (“The fact that the state did not prove [the avoid arrest] aggravator to the trial court’s satisfaction does not require a conclusion that there was insufficient evidence ... to allow the jury to consider the factor.”) (quoting
 
 Bowden v. State,
 
 588 So.2d 225, 231 (Fla.1991)). Accordingly, the trial court did not err in instructing the jury on the avoid arrest aggravator.
 

 D. Proportionality
 

 McLean further claims that his death sentence is disproportionate. This claim is without merit.
 

 Proportionality review “is not a comparison between the number of aggravating and mitigating circumstances.”
 
 Crook v. State,
 
 908 So.2d 350, 356 (Fla.2005) (quoting
 
 Urbin v. State,
 
 714 So.2d 411, 416 (Fla.1998)). Instead, the Court considers the totality of the circumstances to determine if death is warranted in comparison to other cases where the death sentence has been upheld.
 
 Davis v. State,
 
 859 So.2d 465, 480 (Fla.2003).
 

 The circumstances of this case reveal murder by shooting, committed during the course of a robbery. Evidence was presented indicating that McLean was of average intelligence and suffered from borderline personality disorder. McLean was a felon on probation and was also subject to the prior violent felony aggravator based on his previous conviction for armed robbery and for his contemporaneous conviction for attempted first-degree murder. Of these three aggravators, the trial court gave “moderate weight” to McLean’s status as a felon on probation, “great weight” to the contemporaneous robbery, and “great weight” to McLean’s prior violent felony convictions. The trial court gave “little weight” to the statutory mental miti-gators of McLean’s mental or emotional disturbance at the time of the crime and his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, “little weight” to the nonstatutory mitigators of substance abuse issues, family problems, brain injury, and miscellaneous factors, and “no weight” to the nonstatutory mitigators of mental health issues and the disparate treatment of codefendants.
 

 Considering those circumstances, the aggravating and mitigating factors weighed by the trial court, and other cases with similar facts, we conclude that the death sentence imposed on McLean is proportionate.
 
 See, e.g., Hayward v. State,
 
 24 So.3d 17 (Fla.2009) (death sentence proportionate with prior violent felony ag-gravator and merged committed during a robbery/committed for pecuniary gain ag-gravator and nonstatutory mitigators including academic problems, an absent father, some capacity for rehabilitation, and financial stress at the time of the crime);
 
 LaMarca v. State,
 
 785 So.2d 1209 (Fla.2001) (death sentence proportionate with prior violent felony aggravator and non-statutory mitigators of good behavior at trial, substance abuse issues, and mental disorders);
 
 Shellito v. State,
 
 701 So.2d 837 (Fla.1997) (death sentence proportionate with prior violent felony aggravator and merged pecuniary gain/committed during a robbery aggravator and mitigators involving the defendant’s age, background, and character);
 
 Pope v. State,
 
 679 So.2d 710 (Fla.1996) (death sentence proportionate with prior violent felony aggravator and pecuniary gain aggravator, statutory mitigators of mental or emotional disturbance at the time of the crime and impaired capacity to appreciate the criminality of conduct or to conform conduct to the requirements of the law, and nonstatutory mitigators including that defendant was
 
 *1053
 
 intoxicated, was under the influence of mental or emotional disturbance, and acted after a disagreement with his girlfriend);
 
 Heath v. State,
 
 648 So.2d 660 (Fla.1994) (death sentence proportionate with prior violent felony aggravator and commission during a robbery aggravator and mitigators of extreme mental or emotional disturbance caused by substance abuse, good character demonstrated in prison, and disparate treatment of code-fendant).
 

 III. SUFFICIENCY
 

 McLean does not challenge the sufficiency of the evidence, but in death sentence appeals, this Court independently reviews the record to confirm that the jury’s verdict is supported by competent, substantial evidence.
 
 See Delgado v. State,
 
 948 So.2d 681, 689 (Fla.2006).
 

 The following evidence presented at trial is consistent with McLean’s guilt: (1) McLean’s two coperpetrators testified against him and described his participation in the crimes; (2) one of the victims identified McLean as the shooter in both photographic and live lineups; (3) several items containing McLean’s DNA were found discarded near the getaway car; (4) a .380 handgun of the type McLean was seen •wielding during the crime was found discarded near the getaway car and was consistent with the bullets that killed Jahvon Thompson; (5) images of a similar-looking handgun were found on McLean’s cell phone; (6) cell phone records revealed calls between McLean and his coperpetrator Lewin on the day of the crimes; and (7) Lewin testified that McLean stated his motive for the murder was that “he wanted to feel what it feels like to shoot and kill somebody.”
 

 Based on all of the above, we find the evidence sufficient to support McLean’s first-degree felony murder conviction.
 

 IV. CONCLUSION
 

 For the foregoing reasons, we affirm McLean’s conviction and his sentence of death.
 

 It is so ordered.
 

 PARIENTE, LEWIS, CANADY, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 QUINCE, C.J., concurs in result only.
 

 [1]
 

 . We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.
 

 [2]
 

 . Jaggon was sentenced to twenty-three years for second-degree murder and attempted home invasion robbery. Lewin received a twenty-year sentence for burglary of a dwelling and attempted home invasion robbery.
 

 [3]
 

 .
 
 Spencer v. State,
 
 691 So.2d 1062 (Fla.1996).
 

 [4]
 

 .
 
 Nelson v. State,
 
 274 So.2d 256 (Fla. 4th DCA 1973).
 

 [5]
 

 . McLean also claims that Florida’s capital sentencing scheme is unconstitutional under
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We do not need to reach this issue because the prior violent felony aggravator applies in this case.
 
 See Bryant v. State,
 
 901 So.2d 810, 823 (Fla.2005) (holding that
 
 Ring
 
 does not apply when one of the aggravating circumstances is a prior violent felony aggravator).