# Supreme Court of Florida

—————————

No. SC13-632

—————————

**DERRICK MCLEAN**,
Appellant,

vs.

**STATE OF FLORIDA**,
Appellee.

—————————

No. SC13-1788

—————————

**DERRICK MCLEAN**,
Petitioner,

vs.

**MICHAEL D. CREWS, etc.**,
Respondent.

[June 19, 2014]

PER CURIAM.

Derrick McLean appeals an order of the circuit court denying his motion for

postconviction relief filed under Florida Rule of Criminal Procedure 3.851 and

petitions this Court for a writ of habeas corpus.[1]  For the reasons that follow, we

affirm the denial of his postconviction motion and deny his habeas petition.

## I.  FACTS AND PROCEDURAL HISTORY

Derrick McLean was convicted of the 2004 first-degree murder of Jahvon

Thompson and was sentenced to death.  On direct appeal, we described the facts as

follows:

> The evidence at trial revealed that on November 24, 2004,
> McLean, along with his cousin, Maurice Lewin, and acquaintance,
> James Jaggon, drove to the apartment where the victim, fifteen-year-
> old Jahvon Thompson, lived with his father in Orlando.  McLean,
> Lewin, and Jaggon planned that morning to rob the apartment of
> marijuana or money or both.  On the way to the apartment, the three
> men agreed that McLean and Jaggon would commit the robbery and
> Lewin would wait in the car.  Although all three men had guns, there
> was no discussion of shooting or killing anyone during the
> commission of the robbery.  McLean and Jaggon, each armed with a
> gun, knocked on the victim's door and, when the victim opened the
> door, rushed into the apartment.  McLean was wearing a black
> baseball cap and batting gloves, and Jaggon was wearing a ski mask.
> Lewin remained nearby in the car, his gold Buick, and maintained an
> open line between his Samsung cell phone and McLean's Nokia cell
> phone.
> Meanwhile, the victim's next-door neighbor, Theothlus Lewis,
> heard loud noises he thought might be music coming from
> Thompson's apartment.  Lewis told his girlfriend that he was going
> over to Thompson's apartment to ask him to turn down the music.
> When Lewis knocked on the door, McLean opened the door,
> brandished a gun, and motioned for Lewis to enter the apartment.
> When Lewis entered the living room area, McLean asked him "where
> was the money at," and Lewis turned his pockets inside-out, revealing
> he had nothing.

---

1.  We have jurisdiction.  <u>See</u> art. V, § 3(b)(1), (9), Fla. Const.

Then, Lewis saw Jahvon Thompson and Jaggon come from the hallway. Both Thompson and Lewis were ordered to sit on the couch. While McLean searched the apartment, Jaggon held Lewis and Thompson at gunpoint. At some point, McLean grabbed a blue pillow sham from a shelf and ordered Jaggon to leave the apartment, telling him to shoot the female next door if he saw her. Lewis testified that he sensed danger from the look in McLean's eyes, so he dove to the floor, crawling toward the back of the apartment. McLean shot at Lewis, hitting him once in the back, and then fired several more shots at Thompson. The medical examiner found that each of the three gunshots to Thompson's chest would have been fatal. After waiting for McLean to leave, Lewis returned to his apartment, where his girlfriend and her daughter had already called 911.

Meanwhile, Lewin and Jaggon drove off, McLean left the scene on foot, and the three men met up at a nearby restaurant. McLean, still carrying the blue pillow sham from the apartment, got into the car with Lewin and Jaggon, and Lewin pulled the car out onto the road. A police officer, who was driving an unmarked car in the vicinity and had been notified of the shooting, saw the gold Buick pass by, and he activated his lights and initiated pursuit. Lewin sped up and attempted to elude the officer but soon crashed into the marked patrol car of a sheriff's deputy who was investigating an unrelated incident nearby. The deputy, who was in his marked car, saw the Buick coming at him and ran from his vehicle in order to get out of the way. Lewin's car struck the marked car, sending it into the deputy, who was struck in the hip and thrown fifteen to twenty feet. The deputy saw Jaggon sitting in the front passenger seat of the Buick. He also saw McLean running from the Buick.

Additional law enforcement arrived on the scene of the crash. Officers who searched the area discovered a batting glove, black baseball cap, Nokia cell phone, shirt, and handgun discarded in the woods adjacent to the crash. A blue pillow sham containing marijuana was found in the backseat of Lewin's Buick. McLean's DNA was later detected on the shirt, pillow sham, and batting glove. The Nokia cell phone discovered in the woods near the crash was determined to be registered to McLean's girlfriend. Cell phone records revealed calls between this Nokia phone and Lewin's phone on the day of the crime. The Nokia phone also contained images of a semiautomatic firearm.

At trial, Lewin and Jaggon testified that the weapon McLean carried during the crimes was a .380. Eight shell casings found in the victim's apartment were consistent with having been fired from a .380 Hi-Point semiautomatic. About six months after the crime, law enforcement found a .380 Hi-Point semiautomatic in the woods about fifteen feet from the road where the crash had occurred. This handgun appeared to be the weapon in the images found on McLean's cell phone.

The day after the crimes, Lewis worked with a police sketch artist to develop a composite of his shooter. Over the next few days, the Orlando Police Department showed Lewis three photo lineups— none including McLean, whose identity they had not yet learned—but Lewis did not recognize any of the individuals as the shooter. On December 1, Jaggon's father told the police that a third man, who was Lewin's cousin and named Derrick, was involved in the crime. A crime line tip also implicated a person named Derrick and provided information about where he lived, and this information led police to identify McLean as a suspect in the crime.

On December 9, police showed Lewis another photo lineup— this one containing McLean—and Lewis identified McLean as the shooter. Lewis said he was 90% certain about his identification but would be absolutely sure if he saw the suspect in person. Police then took McLean into custody for violation of probation, questioned him briefly about the murder, and arranged a live lineup of six individuals from which Lewis identified McLean as the shooter. Lewis also made an in-court identification of McLean as the man who shot him.

At trial, Jaggon and Lewin testified against McLean as part of their plea agreements for charges related to the events of November 24, 2004. Jaggon and Lewin gave consistent accounts of McLean's participation in the crime. Lewin also testified that when he asked McLean why he fired shots during the robbery, McLean replied that he "wanted to feel like what it feels like to shoot and kill somebody."

During the penalty phase, the defense offered expert testimony regarding McLean's psychological, mental, and emotional health as well as testimony from McLean's older brother. One defense psychologist diagnosed McLean with an organic brain impairment, although the psychologist had no medical records or diagnostic studies to confirm any brain injury. Another defense psychologist testified that McLean had some history of substance abuse and functioned at the emotional level of an adolescent. Both

psychologists diagnosed McLean with borderline personality disorder but found that he was of average intelligence. McLean's brother testified to a history of some family dysfunction.

McLean v. State, 29 So. 3d 1045, 1047-49 (Fla.), cert. denied, 131 S. Ct. 153 (2010) (footnotes omitted).

Following the penalty phase, the jury voted nine to three in favor of the death penalty, and the trial court sentenced McLean to death.[2] Id. at 1049. We affirmed McLean's conviction and death sentence on direct appeal.[3] Id. at 1047.

---

2. The trial court found three aggravating factors: (1) McLean was on felony probation when he committed the murder (moderate weight); (2) "McLean was previously convicted of a felony involving the use or threat of violence" (great weight); and (3) the murder occurred during commission of a robbery (great weight). McLean, 29 So. 3d at 1049. The trial court also found two statutory mitigators: (1) that McLean was under extreme mental or emotional disturbance at the time of the crime (little weight); and (2) that "McLean's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law" was substantially impaired (little weight). Id. In addition, the trial court considered the following non-statutory mitigating circumstances: "(1) mental health issues (no weight); (2) substance abuse issues (little weight); (3) disparate treatment of codefendants (no weight); (4) family problems (little weight); (5) brain injury (little weight); and (6) miscellaneous factors, such as poor grades in high school, good behavior in court, and lack of positive role models in his youth (little weight)." Id. at 1049-50.

3. We denied the following claims on direct appeal: (1) that the trial court erred when it admitted the photographic and live lineup identifications because law enforcement failed to offer McLean assistance of counsel; (2) that the trial court erred in conducting a portion of the hearing pursuant to Nelson v. State, 274 So. 2d 256 (Fla. 4th DCA 1973), on McLean's pro se motion to replace or discharge counsel, outside of McLean's presence; (3) "that the trial court erred in instructing the jury on the avoid arrest aggravator;" (4) that McLean's death sentence was disproportionate; and (5) "that Florida's capital sentencing scheme is

In 2011, McLean filed a motion for postconviction relief asserting eleven claims. The circuit court granted an evidentiary hearing on some of the claims, while summarily denying others. Following the evidentiary hearing, the circuit court entered an order denying relief on all claims. McLean now appeals the denial of his postconviction motion and petitions this Court for a writ of habeas corpus.

## II. POSTCONVICTION MOTION

### A. Ineffective Assistance of Counsel During the Guilt Phase

McLean argues that his trial counsel provided ineffective assistance during the guilt phase of his trial by failing to call an expert in eyewitness identification to challenge Lewis's identification of McLean.[4] Because McLean has failed to establish the requirements necessary for relief, we affirm the circuit court's denial.

---

unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002)." McLean, 29 So. 3d at 1050-53 & n.5.

4. McLean also argues that his trial counsel was ineffective for failing to ensure that he was present during a bench conference at the Nelson hearing. We affirm the summary denial of this claim because this issue is procedurally barred as it was already raised and denied on direct appeal. McLean, 29 So. 3d at 1050-51; see also Sireci v. State, 469 So. 2d 119, 120 (Fla. 1985) ("Claims previously raised on direct appeal will not be heard on a motion for post-conviction relief simply because those claims are raised under the guise of ineffective assistance of counsel.").

Following the United States Supreme Court's decision in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), this Court explained that for ineffective assistance of counsel claims to be successful, two factors must be established:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

<u>Bolin v. State</u>, 41 So. 3d 151, 155 (Fla. 2010) (quoting <u>Maxwell v. Wainwright</u>, 490 So. 2d 927, 932 (Fla. 1986)).

The deficiency prong of <u>Strickland</u> "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Strickland</u>, 466 U.S. at 687. There is a strong presumption that counsel's performance was not ineffective, and it is up to the defendant to present evidence to overcome this presumption. <u>Id.</u> at 689. Moreover, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." <u>Id.</u>

In order to establish the prejudice prong of <u>Strickland</u>, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable

probability is a probability sufficient to undermine confidence in the outcome." Franqui v. State, 59 So. 3d 82, 95 (Fla. 2011) (quoting Strickland, 466 U.S. at 694).

Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo. See Sochor v. State, 883 So. 2d 766, 771-72 (Fla. 2004).

In this case, McLean has failed to demonstrate that trial counsel's performance was deficient. At the evidentiary hearing, McLean's trial counsel testified that she discussed issues regarding Lewis's identification of McLean with co-counsel and attempted to have the lineup identifications suppressed, but that given the other independent evidence identifying McLean, including, his likeness to the police sketch, the DNA evidence, and the testimony of his co-defendants as to his role in the crime, it would not have made sense to bring in an expert on eyewitness identification. McLean has failed to demonstrate how counsel's actions were not reasonable given the facts of the case and counsel's perspective at the time. See Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000) ("[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses

have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.").

Additionally, McLean has also failed to establish prejudice. At trial, the defense focused on issues surrounding Lewis's identification of McLean as the shooter, cross-examining Lewis about the identification and arguing during closing arguments that Lewis's identification was questionable. Since the jury was presented with the argument that Lewis's identification of McLean was unreliable, there was no prejudice by trial counsel's failure to call an expert in eyewitness identification. See Rimmer v. State, 59 So. 3d 763, 777 (Fla. 2010) ("Because counsel conducted an effective cross-examination of the eyewitnesses and consistently attacked the eyewitness identifications and the process of making those identifications, [the defendant] has not demonstrated that he was prejudiced by counsel's failure to obtain an eyewitness identification expert.").

Moreover, even without Lewis's identification of McLean, there was substantial evidence linking McLean to the crime, including, his codefendants' testimony as to his role in the crime and his blood and DNA found on an item taken from the victim's home. See McLean, 29 So. 3d at 1048-49. Therefore, there is not a reasonable probability of a different outcome. Our confidence in the outcome is not undermined.

Accordingly, we affirm the circuit court's denial of relief.

## B. The Crimeline Tape

Next, McLean claims that his due process rights were violated by the State's institutional policy of reprocessing tape recordings of tips received by Crimeline, a crime reporting hotline, including a tape recording of a tip made implicating him in the crime of which he was convicted. Additionally, McLean argues that his trial counsel was ineffective for failing to take action to prevent the destruction of this evidence. We disagree and affirm the circuit court's denial of these claims.

McLean's substantive claim that his due process rights were violated by the State's institutional policy of reprocessing the Crimeline tapes is without merit because McLean has failed to establish that the State destroyed the evidence in bad faith. See Guzman v. State, 868 So. 2d 498, 509 (Fla. 2003) (explaining that "[t]he loss or destruction of evidence that is potentially useful to the defense violates due process only if the defendant can show bad faith on the part of the police or prosecution," and that "bad faith exists only when police intentionally destroy evidence they believe would exonerate a defendant" (citing Arizona v. Youngblood, 488 U.S. 51, 57-58 (1988))). McLean has made no allegation, much less established, that the State intentionally destroyed the tape recording in bad faith. Nor has McLean shown that the tape recording was of any exculpatory value, or that the State knew of its potential exculpatory value at the time the tape was reprocessed. Accordingly, we affirm the circuit court's denial of this issue.

We also affirm the denial of the related claim that McLean's trial counsel was ineffective for failing to take action to preserve or compel disclosure of the tape recording. Trial counsel explained at the evidentiary hearing that the defense did not take any action to compel discovery of or preserve the tape recording because it was their understanding that the tape recording had already been reprocessed. Nonetheless, the record establishes that counsel took action to discover as much information as possible concerning the tip. Counsel obtained copies of the reports generated from the calls made into Crimeline concerning this crime, deposed the lead detective as to how this information was used in the case, and made every effort to learn the identity of the caller. McLean has failed to explain how trial counsel's actions were not reasonable under the circumstances or how these actions "fell beyond an 'objective standard of reasonableness,' such that counsel could not be said to be functioning as the 'counsel' guaranteed by the Sixth Amendment." Henry v. State, 948 So. 2d 609, 616 (Fla. 2006) (quoting Strickland, 466 U.S. at 687-88). Therefore, McLean has failed to establish that trial counsel's performance was deficient.

McLean has also failed to establish prejudice. McLean's allegations that the tape recording was of potential exculpatory or impeaching value to his case is completely speculative, and postconviction relief cannot be based on mere speculation. See Maharaj v. State, 778 So. 2d 944, 951 (Fla. 2000)

- 11 -

("Postconviction relief cannot be based on speculation or possibility."). Furthermore, McLean's arrest was not based solely on the tip. Rather, the record reflects that James Jaggon, Sr., the father of one of McLean's codefendants, had contacted police seven days after the crime and told them of McLean's involvement before the Crimeline tip came in. In addition, as discussed on direct appeal, there was independent evidence linking McLean to this crime. See McLean, 29 So. 3d at 1048-49. Therefore, there is not a reasonable probability of a different outcome. Our confidence in the outcome is not undermined.

Accordingly, we affirm the circuit court's denial of relief.

## C. Ineffective Assistance of Counsel During the Penalty Phase

Next, McLean claims that his trial counsel was ineffective for failing to present evidence that he suffered from Attention Deficit Hyperactivity Disorder (ADHD)[5] during the penalty phase. We affirm the circuit court's denial of relief.

McLean has not established prejudice because he has failed to demonstrate that the additional information that he suffered from ADHD would have resulted in mitigation that would undermine "this Court's confidence in the sentence of death

---

5. At the evidentiary hearing, the expert witness, Dr. Eisenstein, who had also been a defense witness at trial, used both the terms ADD and ADHD interchangeably, and explained that ADD "is subdivided into whether or not it's primarily an attention problem or it's a problem of hyperactivity." ADHD is more focused on hyperactivity and conduct, while ADD is more focused on the inability to pay attention for a certain period of time.

when viewed in the context of the penalty phase evidence and the mitigators and aggravators found by the trial court." Hurst v. State, 18 So. 3d 975, 1013 (Fla. 2009); see also Bolin, 41 So. 3d at 155 ("A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied." (quoting Maxwell, 490 So. 2d at 932)).

As explained on direct appeal, the trial court found three aggravating circumstances which were given more weight than the mitigating factors. See McLean, 29 So. 3d at 1049-50. And, although the trial court stated in the sentencing order that ADHD had not been established as a non-statutory mitigating factor, the trial court gave "little weight" to McLean's organic brain injury as a non-statutory mitigating factor, and Dr. Eisenstein had explained on cross-examination at trial that McLean's ADD was part of the organic brain injury.

Moreover, Dr. Eisenstein's testimony at the evidentiary hearing concerning McLean's ADHD and its impact on McLean's behavior was largely cumulative to other testimony presented at trial—that McLean had an impulse control problem, had an inability to think through the consequences of his actions, and that his ability to self-monitor and conform his conduct to the requirements of the law was substantially impaired. See Jones v. State, 998 So. 2d 573, 586 (Fla. 2008) ("We

have repeatedly held that counsel is not ineffective for failing to present cumulative evidence.").

Therefore, McLean has not established prejudice because "[t]he mitigating evidence adduced at the evidentiary hearing combined with the mitigating evidence presented at the penalty phase would not outweigh the evidence in aggravation[.]" Tanzi v. State, 94 So. 3d 482, 491 (Fla. 2012). Therefore, there is not a reasonable probability that additional evidence of McLean's ADHD would have led to a different result. Our confidence in the outcome is not undermined.

Accordingly, we affirm the circuit court's denial of relief.

### D. Remaining Claims

Finally, we affirm the circuit court's summary denial of McLean's claims that: (1) Florida's lethal injection procedure is unconstitutional because it involves a risk that it will cause extreme pain in violation of the Eighth Amendment, (2) section 945.10(1)(g), Florida Statutes, is unconstitutional, and (3) that his constitutional right against cruel and unusual punishment will be violated since he may be incompetent at the time of execution. These claims have been repeatedly rejected by this Court. See, e.g., Chavez v. State, 132 So. 3d 826, 831 (Fla.), cert. denied, 134 S. Ct. 1156 (2014) ("Summary denial of a lethal injection challenge is proper where the asserted reasons . . . are based upon conjecture or speculation."); Henyard v. State, 992 So. 2d 120, 130 (Fla. 2008) ("We [have] previously found

- 14 -

section 945.10 facially constitutional and decline to recede from our decision now."); <u>Hall v. Moore</u>, 792 So. 2d 447, 450 (Fla. 2001) (explaining that it is premature for a death-sentenced individual to present a claim of incompetency with regard to his execution if a death warrant has not been signed).[6]

### III. HABEAS PETITION

McLean raises two claims in his habeas petition: (1) that his appellate counsel was ineffective for failing to raise an allegation of error concerning the State's destruction of the Crimeline tape; and (2) that Florida's capital sentencing scheme, which permits the imposition of a death sentence based on a simple majority jury recommendation violates the Eighth Amendment's evolving standards of decency. We reject both claims and find that no habeas relief is warranted.

While claims of ineffective assistance of appellate counsel are appropriately presented in a petition for a writ of habeas corpus, McLean's claim concerning the Crimeline tip is procedurally barred because he raised this exact argument in his postconviction motion. <u>Johnston v. State</u>, 63 So. 3d 730, 747 (Fla. 2011) (holding

---

6. Because we find all of McLean's claims of error to be procedurally barred or otherwise without merit, we deny McLean's claim that the cumulative impact of the alleged errors deprived him of his right to a fair trial. <u>Bell v. State</u>, 965 So. 2d 48, 75 (Fla. 2007) ("[W]here individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error must fail." (quoting <u>Griffin v. State</u>, 866 So. 2d 1, 22 (Fla. 2003))).

that the defendant's habeas claim was procedurally barred because it could have been or was raised in his postconviction motion); <u>Knight v. State</u>, 923 So. 2d 387, 395 (Fla. 2005) (holding that claims raised in a postconviction motion "cannot be relitigated in a habeas petition"). Moreover, as discussed above, this issue is meritless.

Similarly, McLean's claim that Florida's capital sentencing scheme is unconstitutional because it allows a death sentence recommendation based on a simple majority jury vote has been repeatedly rejected by this Court and is without merit. <u>See, e.g.</u>, <u>Kimbrough v. State</u>, 125 So. 3d 752, 754 (Fla.), <u>cert. denied</u>, 134 S. Ct. 632 (2013) ("[The defendant's] claim 'is subject to our general jurisprudence that non-unanimous jury recommendations to impose the sentence of death are not unconstitutional.' " (quoting <u>Mann v. State</u>, 112 So. 3d 1158, 1162 (Fla. 2013))); <u>Parker v. State</u>, 904 So. 2d 370, 383 (Fla. 2005) ("This Court has repeatedly held that it is not unconstitutional for a jury to recommend death on a simple majority vote.").

## IV.  CONCLUSION

For the foregoing reasons, we affirm the denial of McLean's motion for postconviction relief and deny his habeas petition.

It is so ordered.

POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Two Cases:

An Appeal from the Circuit Court in and for Orange County,
       Julie Hions O'Kane, Judge - Case No. 2004-CF-015923-A-O
and
An Original Proceeding – Habeas Corpus

Mark S. Gruber, Capital Collateral Regional Counsel, Middle Region, Tampa, Florida,

       for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida and Scott Andrew Browne,  Assistant Attorney General, Tampa, Florida,

       for Appellee/Respondent